SAUER *v.* CITY OF NEW YORK.

ERROR TO THE SUPREME COURT OF THE STATE OF NEW YORK.

No. 130. Argued March 21, 1907.—Decided May 27, 1907.

While under the law of the State of New York the owner of land abutting on a street has easements of access, light and air as against the erection of an elevated railway by or for a private corporation for its own exclusive purposes, he has no such easements as against the public use of the streets, or any such structure which may be erected upon the street to subserve and promote the public use, and he is not therefore deprived of his property without due process of law by the erection of such a structure for the public use.

The decision of the Court of Appeals of the State of New York in the *Elevated Railroad Cases* related to the structure of an elevated railroad for a private corporation and did not create any contract within the impairment of obligation clause of the Constitution of the United States between the City of New York and owners of property abutting on the streets which would be violated by the change of grade or erection of a viaduct for public use of the city.

These rules applied to the case of an abutting owner on 155th Street in New York City and *held,* that the erection of the viaduct therein was merely a change of grade and that he was not thereby deprived of his property without due process of law nor was the obligation of any contract impaired by the judgment of the Court of Appeals holding that the rule of the *Elevated Railroad Cases* did not apply in such a case. *Muhlker* v. *Harlem R. R. Co.,* 197 U. S. 544, distinguished.

GEORGE W. SAUER, the intestate of the plaintiffs in error (hereafter called the plaintiff) became, on July 1, 1886, the owner in fee simple of a parcel of land on the corner of One Hundred and Fifty-fifth street and Eighth avenue, in the city of New York. There was then upon the land a building used as a place of public resort. The city of New York was and is the owner of the fee of One Hundred and Fifty-fifth street and Eighth avenue, which it holds in trust for the public for highways.

Before the passage of the act hereinafter referred to One Hundred and Fifty-fifth street had been graded from Eighth

avenue in a westerly direction, until it reached a high and, for street uses, impassable bluff, on the summit of which ran St. Nicholas place, a public highway. The street as laid out on the records, ascends the bluff, and continues westerly to the Hudson River. It extends easterly to the Harlem River at a point where the river is bridged by McComb's Dam Bridge.

In 1887 the legislature of the State of New York enacted a law which authorized the city of New York, for the purpose of improving and regulating the use of One Hundred and Fifty-fifth street, to construct over said street from St. Nicholas place to McComb's Dam Bridge an elevated iron viaduct for the public travel, with the proviso that no railways should be permitted upon it. There was no provision for damages to the owners of land abutting on the street. Subsequently the viaduct was constructed, resting upon iron columns placed in the roadway. The surface of the viaduct consisted of asphalt and paving blocks laid on iron beams. Opposite the plaintiff's land it is sixty-three feet wide and about fifty feet above the surface of the original street, which, except as interfered with by the viaduct, remains unobstructed for public travel. At the junction of the street with Eighth avenue it is widened into a quadrangular platform, 80 by 160 feet in extent. Near the plaintiff's land the viaduct may be reached by a stairway. By the construction and maintenance of the viaduct the plaintiff's access to his land and the free and uninterrupted use of light and air have been impaired, and the value of his property has been decreased by reason of the dust, dirt, and noise occasioned by the structure. This action was brought to enjoin the defendant from maintaining the viaduct, or, in the alternative, for the recovery of damages caused by it. There was judgment for the defendant by the Supreme Court, affirmed by the Appellate Division and the Court of Appeals. 180 N. Y. 27. After the last decision the case was remitted to the Supreme Court, where there was final judgment for the defendant, and it is now here on writ of error under the claim that—

First. Plaintiff has been deprived of his property without due process of law, in violation of § 1 of the Fourteenth Amendment to the Constitution of the United States; and

Second. That the act under which the viaduct was constructed, as construed by the court, impairs the obligation of a contract, in violation of § 10, Article I, of the Constitution of the United States.

*Mr. Abram I. Elkus,* with whom *Mr. Carlisle J. Gleason* was on the brief, for plaintiffs in error:

Plaintiff established a contract within the contract clause of the Federal Constitution, and his easements of light, air and access were property which could not be taken without due process of law. The New York courts have repeatedly declared that the proceedings under which streets in New York City have been opened constitute a contract with the abutting owners.

The statute under which these streets are opened provides that while the city shall be seized in fee of the streets, nevertheless, that the same be kept open for or as a part of the public street. Laws of 1813, Chap. 86, § 178; Laws of 1888, Chap. 402, § 990; Greater New York Charter, § 990, Chap. 418; Laws of 1903; *Story* v. *N. Y. El. R. Co.,* 90 N. Y. 122; *Kane* v. *N. Y. El. R. Co.,* 125 N. Y. 164, 177.

The plaintiff is entitled to enforce this contract. *United States* v. *Ill. Central R. Co.,* 154 U. S. 225, 238; *Fisk* v. *Jefferson Police Jury,* 116 U. S. 132.

By the law of New York, the owner of premises abutting upon the public street has easements of light, air and access in the street, and these easements are property within the protection of the Constitution.

The act in question is unconstitutional and void in providing for the erection of the elevated driveway or viaduct without regard to plaintiffs' property or contract rights.

By New York law the building of an elevated railroad is a use of the streets inconsistent with the covenant that they

shall be maintained as open public streets, and is also a taking of plaintiffs' property. *Story* v. *N. Y. El. R. Co.*, 90 N. Y. 122, and other elevated cases; *Muhlker* v. *N. Y. & H. R. R. Co.*, 197 U. S. 544.

It was not the railroad but the permanent structure which formed the basis of the elevated railroad decisions. See opinion of Danforth, J., in the *Story case*, p. 161; opinion of Tracy, J., p. 169. *Kellinger* v. *Forty-second Street R. R. Co.*, 50 N. Y. 206; *Fobes* v. *R. W. & O. R. R. Co.*, 121 N. Y. 505.

The Elevated Railroad decisions declare such an injury to be a taking of property, as well as a breach of the contract to maintain the streets as open streets. *Muhlker* v. *N. Y. & H. R. Co.*, 197 U. S. 544; *Birrell* v. *N. Y. & H. R. Co.*, 198 U. S. 390; *Kierns* v. *N. Y. & H. R. Co.*, 198 U. S. 390.

This case is stronger for the abutter than the *Muhlker case*.

Plaintiff's contract right arises by virtue of the act of 1813 and the rule of property laid down in the *Story case* in 1882, which has been constantly reiterated by the New York courts.

Upon the faith of the statutory contract and the judicial construction given it plaintiff purchased his property in 1886, thus becoming a party to that contract, which extended to all abutters.

The construction of a statute by a state court becomes a part of the statute, and rights acquired under it may not be impaired by a change of construction. *Ohio Life Ins. Co.* v. *Debolt*, 16 How. 416; *Gelpecke* v. *Dubuque*, 1 Wall. 175; *Louisiana* v. *Pillsbury*, 105 U. S. 278.

*Mr. Chandler P. Anderson* filed a brief as *amicus curiæ* by leave of the court.

*Mr. Theodore Connoly*, with whom *Mr. Terence Farley* was on the brief, for defendant in error:

Chapter 576 of the Laws of 1887 does not deprive the plain-

tiffs in error of any property without due process of law, nor does it violate any of the provisions of the Fourteenth Amendment.

The law in the State of New York is well settled that consequential damages caused by the construction or maintenance of a public improvement, authorized by statute, does not constitute a "taking" within the meaning of the constitutional provision. *Uppington* v. *City of New York*, 165 N. Y. 222, 229.

In *Uppington* v. *City of New York*, 165 N. Y. 222, already cited, the injury was permanent, and the doctrine of the case of *Transportation Company* v. *Chicago* has been often applied by this court to cases of permanent injury, among others in the cases of *Gibson* v. *United States*, 166 U. S. 269, 275; *Wabash R. R. Co.* v. *Defiance*, 167 U. S. 88; *Bauman* v. *Ross*, 167 U. S. 548, 587; *Meyer* v. *Richmond*, 172 U. S. 82, 97; *Scranton* v. *Wheeler*, 179 U. S. 141, 155; *C., B. & Q. Railway Co.* v. *Drainage Commissioners*, 200 U. S. 561, 583; *West Chicago R. R. Co.* v. *Chicago*, 201 U. S. 506, 526.

The construction of the viaduct is practically a change of grade.

It has been urged by plaintiffs in error that the construction of the viaduct is not a change of grade and therefore that the change of grade cases cited do not apply to the present case. The work is, in any event, substantially a change of grade, whether it may be technically so or not, and being such, the case at bar is certainly within the reasoning of the authorities which hold that for a change of grade legally made the city is not liable to abutting owners for damages.

In solving the question as to what is a proper and public use of the streets regard must be had to the changing conditions of city life.

With the march of improvement, new street uses arise. *Sun Publishing Association* v. *The Mayor*, 152 N. Y. 257.

The legislation in question, designed for the improvement of One Hundred and Fifty-fifth street so as to make it more convenient and safer to the travelling public, is a police regu-

lation and the constitutional prohibition against the taking of private property without compensation was not intended as a limitation upon the police powers of the State. *C., B. & Q. Railway* v. *Drainage Commissioners,* 200 U. S. 561, 583–585; *Jones* v. *Brim,* 165 U. S. 182.

The legislation in question contravenes impairment of contract clause of the Constitution.

The *Muhlker case,* 197 U. S. 544 and the *Birrell case,* 198 U. S. 390 can be distinguished. And see *Mead* v. *Portland,* 200 U. S. 148, 163, holding that while the interpretation of a local ordinance or a statute by the highest court of the State is not indisputable and, even though it may conflict with other decisions of the courts of the State, if it does not conflict with any decision made prior to the inception of the rights involved, this court will lean to an agreement with the state court. Citing *Burgess* v. *Seligman,* 107 U. S. 20.

Mr. Justice Moody, after making the foregoing statement, delivered the opinion of the court.

The acts of the defendant for which the plaintiff sought a remedy in the courts of New York may be simply stated. The plaintiff owned land with buildings thereon situated at the junction of One Hundred and Fifty-fifth street and Eighth avenue, two public highways, in which the fee was vested in the city upon the trust that they should be forever kept open as public streets. As One Hundred and Fifty-fifth street was graded at the time the plaintiff acquired his title, it was isolated to a considerable extent from the street system of the city. Its west end ran into a high and practically impassable bluff, which rendered further progress in that direction impossible. The east end ran to the bank of the Harlem River at a grade which rendered access to McComb's Dam Bridge, which crossed the river at that point, impossible. Under legislative authority the city constructed, solely for public travel, a viaduct over One Hundred and Fifty-fifth street, beginning at

the bridge and thence running with gradual ascent to the
top of the bluff. This viaduct enabled travellers to use One
Hundred and Fifty-fifth street, in connection with other
streets of the city, from which it had previously been discon-
nected. The viaduct rested upon columns planted in the street,
and they, and the viaduct itself, to a material extent impaired
the plaintiff's access to his land and the free admission to
it of light and air. The plaintiff, in his complaint, alleged
that this structure was unlawful, because the law under which
it was constructed did not provide for compensation for the
injury to his private property in the easements of access,
light, and air, appurtenant to his estate. The Court of Appeals
denied the plaintiff the relief which he sought, upon the ground
that under the law of New York he had no easements of access,
light, or air, as against any improvement of the street for the
purpose of adapting it to public travel. In other words, the
court in effect decided that the property alleged to have been
injured did not exist. The reasons upon which the decision
of that court proceeded will appear by quotations from the
opinion of the court, delivered by Judge Haight. Judge
Haight said (p. 30):

"The fee of the street having been acquired according to
the provisions of the statute, we must assume that full com-
pensation was made to the owners of the lands through which
the streets and avenues were laid out, and that thereafter
the owners of land abutting thereon hold their title subject
to all the legitimate and proper uses to which the streets and
public highways may be devoted. As such owners they are
subject to the right of the public to grade and improve the
streets, and they are presumed to have been compensated
for any future improvement or change in the surface or grade
rendered necessary for the convenience of public travel,
especially in cities where the growth of population increases
the use of highways. The rule may be different as to peculiar
and extraordinary changes made for some ulterior purpose
other than the improvement of the street, as, for instance,

where the natural surface has been changed by artificial means, such as the construction of a railroad embankment, or a bridge over a railroad, making elevated approaches necessary. But as to changes from the natural contour of the surface rendered necessary in order to adapt the street to the free and easy passage of the public, they may be lawfully made without additional compensation to the abutting owners, and for that purpose bridges may be constructed over streams and viaducts over ravines, with approaches thereto from intersecting streets. . . (p. 33). In the case under consideration as we have seen, One Hundred and Fifty-fifth street continued west to Bradhurst avenue. There it met a steep bluff seventy feet high, on the top of which was St. Nicholas place. The title of the street up the bluff had been acquired and recorded, but it had never been opened and worked as a street. The bluff was the natural contour of the surface, and for the purpose of facilitating easy and safe travel of the public from St. Nicholas place to other portions of the city the legislature authorized the construction of the viaduct in question. It is devoted to ordinary traffic by teams, vehicles and pedestrians. It is prohibited for railroad purposes. It is one of the uses to which public highways are primarily opened and devoted. It was constructed under legislative authority in the exercise of governmental powers for a public purpose. It is not, therefore, a nuisance, and the plaintiff is not entitled to have its maintenance enjoined or to recover in this action the consequential damages sustained."

The plaintiff now contends that the judgment afterwards rendered by the Supreme Court of New York, in conformity with the opinion of the Court of Appeals, denied rights secured to him by the Federal Constitution. This contention presents the only question for our determination, and the correctness of the principles of local land law applied by the state courts is not open to inquiry here, unless it has some bearing upon that question. But it may not be inappropriate to say that the decision of the Court of Appeals seems to be in full accord

with the decisions of all other courts in which the same question has arisen. The state courts have uniformly held that the erection over a street of an elevated viaduct, intended for general public travel and not devoted to the exclusive use of a private transportation corporation, is a legitimate street improvement equivalent to a change of grade; and that, as in the case of a change of grade, an owner of land abutting on the street is not entitled to damages for the impairment of access to his land and the lessening of the circulation of light and air over it. *Selden* v. *Jacksonville*, 28 Florida, 558; *Willis* v. *Winona*, 59 Minnesota, 27; *Colclough* v. *Milwaukee*, 92 Wisconsin, 182; *Walish* v. *Milwaukee*, 95 Wisconsin, 16; *Home Building Company* v. *Roanoke*, 91 Virginia, 52 (cited with apparent approval by this court in *Meyer* v. *Richmond*, 172 U. S. 82, 95); *Willetts Manufacturing Co.* v. *Mercer County*, 62 N. J. Law, 95; *Brand* v. *Multnomah County*, 38 Oregon, 79; *Mead* v. *Portland*, 45 Oregon, 1, affirmed by this court in 200 U. S. 148; *Sears* v. *Crocker*, 184 Massachusetts, 586; (*Semble*) *DeLucca* v. *North Little Rock*, 142 Fed. Rep. 597.

The case of *Willis* v. *Winona*, *supra* is singularly like the case at bar in its essential facts. There, as here, a viaduct was constructed, connecting by a gradual ascent the level of a public street with the level of a public bridge across the Mississippi. An owner of land abutting on the street over which the viaduct was elevated was denied compensation for his injuries, Mr. Justice Mitchell saying (p. 33):

"The bridge is just as much a public highway as is Main street, with which it connects; and, whether we consider the approach as a part of the former or of the latter, it is merely a part of the highway. The city having, as it was authorized to do, established a new highway across the Mississippi, it was necessary to connect it, for purposes of travel, with Main and the other streets of the city. This it has done, in the only way it could have been done, by what, in effect, amounts merely to raising the grade of the centre of Main street in front of the plaintiff's lot. It can make no difference in prin-

ciple whether this was done by filling up the street solidly,
or, as in this case, by supporting the way on stone or iron
columns. Neither is it important if the city raise the grade
of only a part of the street, leaving the remainder at a lower
grade. . . .

"The doctrine of the courts everywhere, both in England
and in this country (unless Ohio and Kentucky are excepted),
is that so long as there is no application of the street to pur-
poses other than those of a highway, any establishment or
change of grade made lawfully, and not negligently performed,
does not impose an additional servitude upon the street, and
hence is not within the constitutional inhibition against
taking private property without compensation, and is not
the basis of an action for damages, unless there be an express
statute to that effect. That this is the rule, and that the facts
of this case will fall within it, is too well established by the
decisions of this court to require the citation of authorities
of other jurisdictions. . . .

"The *New York Elevated Railway* cases cited by plaintiff are
not authority in his favor, for they recognize and affirm the
very doctrine that we have laid down, *Story* v. *New York
Elevated R. R. Co.*, 90 N. Y. 122, but hold that the construction
and maintenance on the street of an elevated railroad operated
by steam, and which was not open to the public for purposes
of travel and traffic, was a perversion of the street from street
uses, and imposed upon it an additional servitude, which
entitled abutting owners to damages."

The cases cited usually recognized the authority of the
*New York Elevated* cases, hereinafter to be discussed, and
approved the distinction from them made by Mr. Justice
Mitchell.

But, as has been said, we are not concerned primarily with
the correctness of the rule adopted by the Court of Appeals
of New York and its conformity with authority. This court
does not hold the relation to the controversy between these
parties which the Court of Appeals of New York had. It was

the duty of that court to ascertain, declare and apply the law
of New York, and its determination of that law is conclusive
upon this court. This court is not made, by the laws passed
in pursuance of the Constitution, a court of appeal from the
highest courts of the States, except to a very limited extent,
and for a precisely defined purpose. The limitation upon
the power of this court in the review of the decisions of the
courts of the States, though elementary and fundamental, is
not infrequently overlooked at the Bar, and unless it is kept
steadily in mind much confusion of thought and argument
result. It seems worth while to refer to the provisions of
the Constitution and laws which mark and define the relation
of this court to the courts of the State. Article III of the
Constitution ordains, among other things, that "the judicial
power shall extend to all cases in law and equity, arising under
this Constitution, the laws of the United States, and treaties
made, or which shall be made, under their authority," and
that the appellate jurisdiction of the Supreme Court shall be
exercised under such regulations as Congress shall make.

It was from this provision of the Constitution that Marshall
in *Cohens* v. *Virginia*, 6 Wheat. 264, derived the power of this
court to review the judgments of the courts of the States,
and, in defining the appellate jurisdiction, the Chief Justice
expressly limited it to questions concerning the Constitution,
laws and treaties of the United States, commonly called
Federal questions, and excluded altogether the thought that
under the Congressional regulation the jurisdiction included
any power to correct any supposed errors of the state courts
in the determination of the state law. Such was the expressed
limitation of the original judiciary act, in its present form
found in section 709 of the Revised Statutes, which has been
observed by this court in so many cases that the citation of
them would be an idle parade. It is enough to refer to *Mur-
dock* v. *Memphis*, 20 Wall. 590, where, after great consideration,
it was held that under the judiciary act, as amended to its
present form, this court was limited to the consideration of

the Federal questions named in the Constitution. This court, whose highest function it is to confine all other authorities within the limits prescribed for them by the fundamental law, ought certainly to be zealous to restrain itself within the limits of its own jurisdiction, and not be insensibly tempted beyond them by the thought that an unjustified or harsh rule of law may have been applied by the state courts in the determination of a question committed exclusively to their care.

In the case at bar, therefore, we have to consider solely whether the judgment under review has denied to the plaintiff any right secured to him by the Federal Constitution. He complains:

First. That he was denied the due process of law secured to him by the Fourteenth Amendment, in that his property was taken without compensation; and

Second. That the law which authorized the construction of the viaduct, as interpreted by the Court of Appeals of New York, impaired the obligation of the contract with the city of New York, which is implied from the laying out of the street, in violation of article I, § 10, paragraph 1, of the Constitution. The contentions may profitably be considered separately.

Has the plaintiff been deprived of his property without due process of law? The viaduct did not invade the plaintiff's land. It was entirely outside that land. But it is said that appurtenant to the land there were easements of access, light and air, and that the construction and operation of the viaduct impaired these easements to such an extent as to constitute a taking of them. The only question which need here be decided is whether the plaintiff had, as appurtenant to his land, easements of the kind described; in other words, whether the property which the plaintiff alleged was taken existed at all. The court below has decided that the plaintiff had no such easements; in other words, that there was no property taken. It is clear that under the law of New York an owner of land abutting on the street has easements of access, light

and air as against the erection of an elevated roadway by or
for a private corporation for its own exclusive purposes, but
that he has no such easements as against the public use of
the streets or any structures which may be erected upon the
street to subserve and promote that public use. The same
law which declares the easements defines, qualifies and limits
them. Surely such questions must be for the final determina-
tion of the state court. It has authority to declare that the
abutting land owner has no easement of any kind over the
abutting street; it may determine that he has a limited ease-
ment; or it may determine that he has an absolute and unquali-
fied easement. The right of an owner of land abutting on
public highways has been a fruitful source of litigation in
the courts of all the States, and the decisions have been con-
flicting, and often in the same State irreconcilable in principle.
The courts have modified or overruled their own decisions,
and each State has in the end fixed and limited, by legislation
or judicial decision, the rights of abutting owners in accordance
with its own view of the law and public policy. As has already
been pointed out, this court has neither the right nor the duty
to reconcile these conflicting decisions nor to reduce the law
of the various States to a uniform rule which it shall announce
and impose. Upon the ground, then, that under the law of
New York, as determined by its highest court, the plaintiff
never owned the easements which he claimed, and that there-
fore there was no property taken, we hold that no violation
of the Fourteenth Amendment is shown.

The remaining question in the case is whether the judg-
ment under review impaired the obligation of a contract.
It appears from the cases to be cited that the courts of New
York have expressed the rights of owners of land abutting
upon public streets to and over those streets in terms of con-
tract rather than in terms of title. In the city of New York
the city owns the fee of the public streets (whether laid out
under the civil law of the Dutch regime, or as the result of
conveyances between the city and the owners of land, or by

condemnation proceedings under the statutory law of the State) upon a trust that they shall forever be kept open as public streets, which is regarded as a covenant running with the abutting land. Accepting, for the purposes of this discussion, the view that the plaintiff's rights have their origin in a contract, then it must be that the terms of the trust and the extent of the resulting covenant are for the courts of New York finally to decide and limit, providing that in doing so they deny no Federal right of the owner. The plaintiff asserts that the case of *Story* v. *Elevated Railroad*, 90 N. Y. 122, decided in 1882, four years before he acquired title to the property, interpreted the contract between the city of New York and the owners of land abutting upon its streets as assuring the owner easements of access, light and air, which could not lawfully be impaired by the erection on the street of an elevated structure designed for public travel; that he is entitled to the benefit of his contract as thus interpreted, and that the judgment of the court denying him its benefits impaired its obligation. If the facts upon which this claim is based are accurately stated, then the case comes within the authority of *Muhlker* v. *Railroad Co.*, 197 U. S. 544, which holds that when the Court of Appeals has once interpreted the contract existing between the land owner and the city that interpretation becomes a part of the contract, upon which one acquiring land may rely, and that any subsequent change of it to his injury impairs the obligation of the contract. It will be observed that it is an essential part of the plaintiff's case that he should show that his contract had been interpreted in the manner he states. It therefore becomes necessary to examine the *Story case*, wherein, he asserts, such an interpretation was made. In order to ascertain precisely what that case decided we may consider other decisions of the Court of Appeals, though they are later in time than the acquisition of the plaintiff's title.

The plaintiff in the *Story case* held the title to land, injuriously affected by the construction of an elevated railroad,

as a successor to a grantee from the city. In the deed of the
city the land was bounded on the street and contained a
covenant that it should "forever thereafter continue and
be for the free and common passage of, and as public streets
and ways for, the inhabitants of said city, and all others
passing through or by the same, in like manner as other streets
of the same city now are, or lawfully ought to be." It was
held that by virtue of this covenant, which ran with the land,
the plaintiff was entitled to easements in the street of access,
and of free and uninterrupted passage of light and air; that
the easements were property within the meaning of the con-
stitution of the State, and could not lawfully be taken from
their owner without compensation, and that the erection of
the elevated structure was a taking. The decision rested
upon the view that the erection of an elevated structure for
railroad purposes was not a legitimate street use. "There is
no change," said Judge Danforth (p. 156), "in the street
surface intended; but the elevation of a structure useless for
general street purposes, and as foreign thereto as the house
in Vesey street, *Corning* v. *Lowerre,* 6 Johns. Chan. 439, or
the freight depot, *Barney* v. *Keokuk,* 94 U. S. 324."

"The question here presented," said Judge Tracy (p. 174),
"is not whether the legislature has the power to regulate and
control the public uses of the public streets of the city, but
whether it has the power to grant to a railroad corporation
authority to take possession of such streets and appropriate
them to uses inconsistent with and destructive of their con-
tinued use as open public streets of the city."

In the case of *Lahr* v. *Metropolitan Elevated Railroad Co.,* 104
N. Y. 268, decided in 1887, the plaintiff held title by mesne
conveyances from the owner, from whom the land for the street
had been acquired by condemnation under a statute, which
provided that the land thus taken should be held (p. 289) "in
trust, nevertheless, that the same be appropriated and kept
open for or as part of a public street . . . forever, in
like manner as other public streets . . . in the said city

are, and of right ought to be." It was contended that the principle of the *Story case* should be confined to those who, like Story, held title under a grant from the city with a covenant that the street should be kept open. But the court held that there was no legal difference between the two cases, and that from the condemnation statute a covenant running with the land was implied for the benefit of its owners, and that the plaintiff was entitled to recover damages for the injury to his easements of access, light, and air. But, as in the *Story case*, the extent of the decision was carefully limited. "The logical effect of the decision in the *Story case*," said Chief Judge Ruger (p. 292), "is to so construe the Constitution, as to operate as a restriction upon the legislative power over the public streets opened under the act of 1813, and confine its exercise to such legislation, as shall authorize their use for street purposes alone. Whenever any other use is attempted to be authorized, it exceeds its constitutional authority. Statutes relating to public streets which attempt to authorize their use for additional street uses are obviously within the power of the legislature to enact."

In the case of *Kane* v. *Elevated R. R. Co.*, 125 N. Y. 164, decided in 1891, it appeared that the street there in question was laid out during the Dutch regime, when the town had absolute title to the fee of the streets, with no easement over them in favor of the abutting land. But it was held by the court that by virtue of certain legislation, not necessary here to be stated, New York City owns the fee in all of its streets upon a trust, both for the public and the abutting land, that they shall forever be kept open as public streets, and that as to an abutting owner this trust cannot be violated without compensation. But in the opinion the limits of the principle were again carefully guarded. It was said by Judge Andrews (p. 175): "Under the decisions made there seems to be no longer any doubt in this State that streets in a city laid out and opened under charter provisions may, under legislative and municipal authority, be used for any public use consistent

with their preservation as public streets, and this, although the use may be new, and may seem to impose an additional burden, and may subject lot owners to injury. The mere disturbance of their rights of light, air and access, by the interposition of a new street use, must be borne and gives no right of action." And again (p. 185): "We conclude this part of the case with the remark that neither the *Story* nor the *Lahr case* imposes any limitations upon the legislative power over streets for street uses. They simply hold that the trust upon which streets are held cannot be subverted by devoting them to other and inconsistent uses."

It would be difficult for words to show more clearly, than those quoted from the opinions, that such a case, as that now before us, was not within the scope of the decisions or of the reasons upon which they were founded. The difference between a structure erected for the exclusive use of a railroad and one erected for the general use of the public was sharply defined. It was only the former which the court had in view. That the structure was elevated, and for that reason affected access, light and air, was an important element in the decisions, but it was not the only essential element. The structures in these cases were held to violate the land owners' rights, not only because they were elevated and thereby obstructed access, light and air, but also because they were designed for the exclusive and permanent use of private corporations. The limitation of the scope of the decision to such structures, erected for such purposes, appears not only in the decisions themselves, but quite clearly from subsequent decisions of the Court of Appeals. In the case of *Fobes* v. *R. W. & O. R. R. Co.*, 121 N. Y. 505, Judge Peckham, now Mr. Justice Peckham, made the following statement of the effect of the *Story case.* Certain portions of it are italicized here for the purpose of emphasizing the point now under consideration (p. 517; the italics are ours):

"It was not intended in the *Story case* to overrule or change the law in regard to steam surface railroads. The case em-

bodied the application of what was regarded as well-established principles of law to a new combination of facts, such facts amounting, as was determined, to an absolute and permanent obstruction in a portion of the public street, and in a *total and exclusive use of* such portion *by the defendant,* and such *permanent obstruction and total exclusive use,* it was further held, amounted to taking of some portion of the plaintiff's easement in the street for the purpose of furnishing light, air and access to his adjoining lot. This *absolute* and *permanent obstruction of the street, and this total and exclusive use of a portion thereof by the defendant were accomplished by the erection of a structure for the elevated railroad of the defendant;* which structure is fully described in the case as reported.

"The structure, by the mere fact of its existence in the street, permanently and at every moment of the day took away from the plaintiff some portion of the light and air which otherwise would have reached him, and, in a degree very appreciable, interfered with and took away from him his facility of access to his lot; such interference not being intermittent and caused by the temporary use of the street by the passage of the vehicles of the defendant while it was operating its road through the street, but caused by the iron posts and by the superstructure imposed thereon, and existing for every moment of the day and night. *Such a permanent, total, exclusive and absolute appropriation of a portion of the street as this structure amounted to* was held to be illegal and wholly beyond any legitimate or lawful use of a public street. The taking of the property of the plaintiff in that case was held to follow upon the *permanent and exclusive nature of the appropriation by the defendant of the public street, or some portion thereof.*"

The distinction between the erection of an elevated structure for the exclusive use of a private corporation and the same structure for the use of public travel is clearly illustrated in the contrast in the decisions of *Reining* v. *Railroad,* 128 N. Y. 157, and *Talbot* v. *Railroad,* 151 N. Y. 155. In the first case

it was held that the abutting land owner had the right to compensation for the construction of a viaduct in the street for the practically exclusive occupation of a railroad. In the second case it was held that the abutting owner had no right of compensation for the erection of a public bridge with inclined approaches, and a guard wall, to carry travel over a railroad, although the structure impaired the access to his land. We are not concerned with the question whether the distinction between an elevated structure for the exclusive use of a corporation and the same structure for the purposes of public travel is, so far as an abutting land owner is concerned, a just or harsh one, provided it is a clear distinction based upon real differences. We think that before the plaintiff had acquired his title the law of New York had plainly drawn this distinction. The highest court of the State had held that the contract of the owner of land abutting on streets entitled him to the right of unimpaired access and uninterrupted circulation of light and air as against an elevated structure erected for the exclusive use of a private corporation, had, with scrupulous care, refrained from holding that he had the same right as against an elevated structure of the same kind erected for the purpose of public travel, and had pointed out plainly the essential distinction between the two cases. This distinction, as we have already seen, has been made or approved by the courts of other States wherever the occasion to consider it arose, and it is a real and substantial distinction which arises out of the trust upon which the public owns the public highways.

The trust upon which streets are held is that they shall be devoted to the uses of public travel. When they, or a substantial part of them, are turned over to the exclusive use of a single person or corporation, we see no reason why a state court may not hold that it is a perversion of their legitimate uses, a violation of the trust, and the imposition of a new servitude. But the same court may consistently hold that with the acquisition of the fee, and in accordance with the trust,

the city obtained the right to use the surface, the soil below, and the space above the surface, in any manner which is plainly designed to promote the ease, facility and safety of all those who may desire to travel upon the streets; and that the rights attached to the adjoining land, or held by contract by its owner, are subordinate to such uses, whether they were foreseen or not when the street was laid out. In earlier and simpler times the surface of the streets was enough to accommodate all travel. But under the more complex conditions of modern urban life, with its high and populous buildings, and its rapid interurban transportation, the requirements of public travel are largely increased. Sometimes the increased demands may be met by subways and sometimes by viaducts. The construction of either solely for public travel may well be held by a state court to be a reasonable adaptation of the streets to the uses for which they were primarily designed. What we might hold on these questions, where we had full jurisdiction of the subject, it is not necessary here even to consider.

In basing its judgment on the broad, plain and approved distinction between the abandonment of the street to private uses and its further devotion to public uses, the court below overruled none of its decisions, but, on the contrary, acted upon the principles which they clearly declared. The plaintiff, therefore, has not shown that in his case the state court has changed, to his injury, the interpretation of his contract with the city, which it had previously made, and upon which he had the right to rely. The case at bar is not within the authority of the *Muhlker case.* When Muhlker acquired his title the elevated railroad cases had declared the law of New York and it was here held that he had the right to rely upon his contract as in them it had been interpreted. The structure complained of was in the *Muhlker case,* as in the *Elevated Railroad case,* one devoted to the exclusive use of a private corporation. This court, in order to obtain jurisdiction and to declare that a Federal right was violated, was obliged to hold, and did hold, that the two cases were identical, and that

in deciding the *Muhlker case* the Court of Appeals had in effect overruled the *Elevated Railroad Cases,* and this view was supported by the Court of Appeals itself in *Lewis* v. *Railroad,* 162 N. Y. 202, where a plaintiff in like situation with Muhlker had obtained damages for exactly the same structure. The theory upon which the *Muhlker case* stands and upon which it was put in the opinion of the court, is that in deciding against Muhlker the state court had overruled its own decisions, and changed the interpretation of the contract upon which he had the right to rely. But the fundamental fact upon which the decision in the *Muhlker case* rested, present there, is absent in the case at bar. Here there was no overruling of decisions and no change in the interpretation of the contract. There was, therefore, no impairment of the obligation of a contract, and the decision was merely on a question of local law, with the soundness of which we have no concern.

The judgment is

*Affirmed.*

MR. JUSTICE McKENNA, dissenting:

I am unable to agree with the opinion and judgment of the court. I think this case cannot be distinguished in principle from *Muhlker* v. *Harlem Railroad Co.,* 197 U. S. 544; *Burrell* v. *New York & Harlem Railroad Co.* and *Kierns* v. *New York & Harlem Railroad Co.,* 198 U. S. 390. On the authority of those cases the judgment in this case should be reversed. Those cases were determined by *Story* v. *Elevated Railroad,* 90 N. Y. 122, and *Lahr* v. *Metropolitan Elevated Railroad Co.,* 104 N. Y. 268, known as the *Elevated Railroad cases.* The structures there described are what are known as elevated railroads, and may be presumed to be familiar, and a structure of substantially similar character was the subject of the controversy in *Muhlker* v. *Harlem Railroad Co., Burrell* v. *Same* and *Kierns* v. *Same.* Its characteristic was elevation above the *surface* of the street, and this was the point of the decisions. Let me quote from the *Story case:* "But what," said the court,

"is the extent of this easement? What rights or privileges are secured thereby? Generally, it may be said, it is to have the street kept open, so that from it access may be had to the lot and light and air furnished across the *open way*. The street occupies the *surface*, and to its uses the rights of the adjacent lots are subordinate, but *above the surface* there can be no lawful obstruction to the access of light and air, to the detriment of the abutting owner." And again, it was said that the agreement—grant from the city—was "that if the grantee would buy the lot abutting on the street he might have the use of light and air *over the open space* [italics mine] designated as a street." And yet again (and the passage was quoted in the *Muhlker* case, page 566): "Before any interest passed to the city the owner of the land had from it the benefit of air and light. *The public purpose of a street requires of the soil the surface only*." The *Lahr* case repeated the principle. And it was said in the *Muhlker case*, in effect, that the disregard of the distinction between the surface of a street and the space above the surface would leave "remaining no vital element of the *Elevated Railroad cases*."

It may be said there was a qualification made in those cases and recognized in the *Muhlker case*, that it was not alone the elevation of a structure above the surface, but the elevation of one "useless for general street purposes." I may accept the limitation. The structure in the case at bar comes within the characterization. It is useless for general street purposes. It obstructs the frontage of abutting lots and affords no access to or from them in any proper sense. There is a descent by stairs from it to the street below, but for pedestrians only—necessarily not for vehicles. But there is a like descent by stairs from elevated railroads to streets below, but this did not save the roads from liability for abutting property.

It must be borne in mind that this case is not disposed of by making a contrast between the passage of a railroad and the traffic on a street. The contrast is catching and only seems important. In New York a railroad is a street use and can be

imposed on the surface of a street without liability for consequential damages, and this even if it be a steam railroad. *Fobes* v. *R. W. & O. R. Co.*, 121 N. Y. 505. The distinction, therefore, was necessary to be made between the *surface* and the open space over the surface. And we have seen that this distinction was noted in the cases and determined their judgment. In other words, the use of a street by a railroad was decided to be a proper street use, and, therefore, whether put upon the surface or above the surface, retained that character. In either place it was a proper street use and damages could only have been consequent to the elevation of the road above the surface, to which, to quote again the *Story case*, the "public purpose of a street" attached only.

The *Elevated Railroad cases* get significance from the arguments of counsel. Such arguments, of course, are not necessarily a test of the decision. But they may be. The opinion may respond accurately to them. We find from the report of the *Story case* that the argument of Mr. Evarts for the plaintiff was that "a permanent structure above the surface, and an encroachment thereby, and by its use upon the appurtenant easement of the open frontage held by the abutting proprietors, was not covered by the original condemnation for the public easement, which was limited to a maintenance of such open streets and perpetual frontage. *People* v. *Kerr*, 27 N. Y. 188; *Craig* v. *Rochester R. R. Co.*, 39 N. Y. 404."

Mr. Choate, also for the property owners, submitted the following: "The abutting owners on the streets have an interest in the nature of property for all time in the streets above their surface, and in having them kept open and unobstructed forever, of which they cannot be deprived without being compensated." The contentions express the invocation of the property owner of the court, and the court responded to and sustained it. Is not that response rejected in the case at bar? The structure in the case towers as high as a house of five stories and is planted on columns, the size and strength and number of which can easily be imagined. Does it need any

comment to describe its effect? The plaintiffs have really no access to it from their land or from any building that may be put upon their land, because they may not bridge the intervening gap. They have no other access to it but that which I have described. The public has no access from it to plaintiffs' property but that which I have described.

The buildings that stood upon the land when the structure was built were practically under its shadow.[1] Any buildings that may be erected will be equally so. "To get above it," plaintiffs' counsel asserts, "the abuttor must build up five stories," and it is only from such elevation that he may contemplate the traffic that passes his premises, and must pass his premises. And even then, counsel also asserts, light can only reach the abuttor "through a slit ten feet wide between his eaves and the edge of the structure." And to this measure his right to an unobstructed frontage, his right to unobstructed light and air, has been reduced. Is it possible that the law can see no legal detriment in this, no impairment of the abuttor's grant from the city, no right to compensation?

I am not insensible of the strength of the reasoning by which this court sustains that conclusion, but certainly all lawyers would not assent to it. Indeed one must be a lawyer to assent to it. At times there seems to be a legal result which takes no account of the obviously practical result. At times there seems to come an antithesis between legal sense and common sense.

I say this in no reproach of the law and its judgments. I say it in no reproach to the opinion of the court. I recognize it proceeds upon distinctions which are intelligible, although

---

[1] When the original plaintiff, George Sauer, became the owner of the property there were standing upon it certain frame buildings, which had been used as a pleasure resort. In 1890 he enlarged and improved the buildings at great expense and occupied them at the time of the erection of the structure in controversy. These buildings were destroyed in 1897 by fire, and the land is now vacant. And it may be noted that Sauer having died pending this writ of error, his administratrix and heirs have been substituted as parties plaintiff.

I do not assent to them. My purpose is only to express the view that the legal opinion which I hold has justification in the serious practical consequences that the plaintiffs in error have sustained, by the violation of a right which this court said, in the *Muhlker case*, citing *Barnett* v. *Johnson*, 15 N. J. Eq. 481, was founded in the "common practice and sense of the world."

From my standpoint, what the courts of States other than New York have decided is of no consequence to the pending controversy, and I take no time therefore to dispute the pertinence of their citation to justify the structure of which plaintiffs complain.

I am authorized to say that MR. JUSTICE DAY concurs in this dissent.