Winifred HAEUSSLER, et al., petitioners, Respondents,

v.

Richard BRAUN, Commissioner of Transportation, State of Minnesota, Appellant.

No. 51470.

Supreme Court of Minnesota.

Dec. 17, 1981.

Warren Spannaus, Atty. Gen., and John Jeppesen, Sp. Asst. Atty. Gen., St. Paul, for appellant.

Lauhead & Morrow and George T. Morrow II, Minneapolis, for respondents.

AMDAHL, Justice.

This is an appeal from an order of the Hennepin County District Court granting respondents a writ of mandamus directing the Commissioner of Transportation to institute eminent domain proceedings against respondents' properties. We reverse.

The issue is whether the trial court erred in finding that the state had taken respondents' properties without just compensation.

The controversy centers on one of the effects of the state's decision to build approximately 30 miles of sound barriers along Interstate 35W, which allegedly interferes with the respondents' implied easements for light, air, and view over a public street. The stretch of sound barriers complained of in the instant case was constructed in 1979 pursuant to Minn.Stat. § 161.-125(1) (1980), which provides in pertinent part:

> The commissioner of transportation shall, in accordance with the department's program, implement sound abatement measures within or along the perimeter of any interstate or trunk highway within incorporated areas located within the metropolitan area or any municipality whenever the noise level attributable to vehicular traffic at the abutting residential property line is in excess of the federal noise standards. The commissioner shall utilize federal matching funds available for constructing and maintaining sound abatement measures.

These particular barriers stand along both sides of Interstate 35W between the crossroads of 31st and 35th Streets in Minneapolis. The sound barriers consist of reinforced concrete pillars embedded in the ground to provide support. Nailing strips, to which long wood planking was nailed, were fastened to the pillars. The pillars face the interstate, leaving the smooth wooden wall to face the properties abutting the barriers. The barriers are the only structures that stand between respondents' properties and the interstate.

Respondents own properties that abut the frontage roads along this strip of 35W. Mr. and Mrs. Haeussler own a home that fronts on Second Avenue South, the frontage road located to the east of 35W. Their property lies on the east side of Second Avenue and faces the sound barrier that stands a few feet from the curb on the west side of Second Avenue. At the time this case was tried, the barrier had not been completed; only the concrete pillars were in place. The parties stipulated that the completed barrier will stand 23 feet tall at a distance of 55 feet from the Haeusslers' front property line. The parties further agreed that the presence of the barrier will affect the amount of sunlight reaching the Haeusslers' property in the afternoons. Mathematical calculations were performed to determine the amount of sunlight the property will lose on the vernal and autumnal equinoxes. On each of those days the property will lose sunlight 25 minutes earlier at their west property line and 55 minutes earlier at their home's west foundation than it would were there no barrier between the Haeussler property and the interstate.

Mr. and Mrs. Gottsleben's home fronts on Stevens Avenue, the frontage road to the west of this section of 35W. The sound barrier across from the Gottsleben property had been fully constructed prior to trial. That barrier is 22 feet high and is located 53 feet from their east property line. Similar calculations were performed to determine the sound barrier's effect on the sunlight at the Gottslebens' home on each of the equinoxes. On these days the Gottslebens will lose 74 minutes of morning sunlight at their east property line and 47 minutes at the east foundation of their home.

Mr. DeNoma also owns property on this portion of Stevens Avenue. A sound barrier of 21 feet is located 55 feet from his east property line. The mathematical calculations indicate that its presence will cause the morning sunlight to reach the DeNoma property 70 minutes later at the east property line and 47 minutes later at the east foundation of the home.

The respondents argued that they have suffered in ways other than the loss of sunlight due to the presence of the sound barriers. Mrs. Gottsleben testified that the barrier cuts off the view of the highway and traps on her side of the barrier the exhaust fumes from the cars using the frontage road. As a result, she and her husband no longer have breakfast or their morning coffee on the front porch, and they keep their windows closed most of the time. Mr. DeNoma testified that the trapped air burns his nostrils and that as a result of the loss of sunlight, he and his wife use their front room and front door less frequently. In addition, he stated that the sight of the barrier causes his wife to feel depressed and she therefore spends more time sleeping and that he has lost his desire to take care of their yard. Mrs. Haeussler testified that the presence of the wall makes her feel like she is living in a ghetto and as a result she suffers from writers' block and is therefore unable to complete her unfinished novel and stories.

The testimony of a civil engineer confirmed the respondents' observations relative to the barriers' impact on the air flow around their properties. Although the presence of the barriers channelizes the pollution from the highway, keeping it for the most part localized between the barriers, it alters the wind flow across the properties downwind of the barriers. This results in air eddies, and has the effect of trapping the pollution from the frontage roads on the abutting landowners' side of the sound barriers.

The respondents brought their action in inverse condemnation, arguing that the erection of the sound barriers had substantially interfered with their implied easements for light, air, and view,[1] resulting in a taking of these property interests. The trial court agreed and issued a writ of mandamus directing the Commissioner of Transportation to commence condemnation proceedings.

1. Respondents argued below that their property had been taken without just compensation in violation of Minn.Const. art. 1, § 13, which provides that "[p]rivate property shall not be taken, destroyed or damaged for public use without just compensation therefor." The property allegedly taken consists of respondents' implied easements for light, air, and view over the public streets fronting their homes. We find no taking has occurred.

■ This state has long recognized that a landowner owning property abutting a public street possesses as appurtenant to his lot implied easements for light, air, and view over the public street. *Adams v. Chicago, Burlington & Northern Railway*, 39 Minn. 286, 39 N.W. 629 (1888); *see McCarthy v. City of Minneapolis*, 203 Minn. 427, 281 N.W. 759 (1938). These easements extend to the full width of the street and are independent of any fee interest in the street held by the landowner. *Adams*, 39 Minn. at 295–296, 39 N.W. at 63.

The implied easements for light, air, and view are a limited interest in property, subservient to the public right to travel on the roadway. Conversely, the public easement is broad. As this court stated long ago:

If there is any one fact established in the history of society and of the law itself, it is that the mode of exercising [the public] easement is expansive, developing and growing as civilization advances. In the most primitive state of society the conception of a highway was merely a footpath; in a slightly more advanced state it included the idea of a way for pack animals; and, next, a way for vehicles drawn by animals,—constituting, respectively, the "iter", the "actus", and the "via" of the Romans. And thus the methods of using public highways expanded with the growth of civilization, until to-day our urban highways are devoted to a variety of uses not known in former times, and never dreamed of by the owners of the soil when the public easement was acquired. Hence it has

1. The respondents averred in their pleadings that the barriers also interfered with their right of access to the highway. That claim was dismissed at the time of trial.

become settled law that the easement is not limited to the particular methods of use in vogue when the easement was acquired, but includes all new and improved methods, the utility and general convenience of which may afterwards be discovered and developed in aid of the general purpose for which highways are designed. And it is not material that these new and improved methods of use were not contemplated by the owner of the land when the easement was acquired, and are more onerous to him than those in use.

*Cater v. Northwestern Telephone Exchange Co.*, 60 Minn. 539, 543, 63 N.W. 111, 112 (1895).

█ It is this public easement that defines, qualifies, and limits the implied easements for light, air, and view. See *Sauer v. New York*, 206 U.S. 536, 547–548, 27 S.Ct. 686, 689–90, 51 L.Ed. 1176 (1906). Therefore, any interference with the light, air, and view over a public street that results from the public's use of the street as a street, that is, from a proper street use, must be suffered by the abutting landowner without complaint to the courts. This is so because the implied easements do not entitle the landowner to every particle of sunlight or air that passes over the street. Rather, he is only entitled to the air, light, and view that are not obstructed by a proper street use.

This court first discussed the concept of "proper street use" in *Adams*. In holding that the placing of a railroad upon a public street was a perversion of the street, we stated that:

[t]he private right in a street is of course subordinate to the public right. The latter right is for use as a public street, and the incidental right to put and keep it in condition for such use, and for no other purpose. Whatever limitation or abridgement of the advantages which the abutting lot is entitled to from the street, may be caused by the exercise of the public right, the owner must submit to. If putting it to the proper street uses causes annoying noises to be made in front of his

lot, or the air to be filled with dust and smoke, so as to darken his premises, or pollute the air that passes from the street upon them, he has no legal cause of complaint. His right to complain arises when such interruptions to the enjoyment of his private right are caused by a perversion of the street to uses for which it was not intended; by employing it for uses which the public right does not justify.

*Id.* 39 Minn. at 294–295, 39 N.W. at 634.

In *Willis v. City of Winona*, 59 Minn. 27, 60 N.W. 814 (1894), this court held that surface changes to a public street that were necessary to provide access to a bridge designed to cross the Mississippi River were part of a proper street use, and therefore did not constitute a taking of the property. This was so even though the city altered the grading of the street in front of the property, raising it to a height of 25 feet at one spot. Although the court found that the construction of the viaduct materially reduced the value of plaintiff's lot, it was held that the plaintiff's easement had not been taken.

The doctrine of courts everywhere, both in England and in this country * * * is that, so long as there is no application of the street to purposes other than those of a highway, any establishment or change in grade made lawfully, and not negligently performed, does not impose an additional servitude upon the street and hence is not within the constitutional inhibition against taking private property without compensation * * *.

*Id.* at 33–34, 60 N.W. 815.

█ It is only when the light, air, and view over a public street are obstructed by improper street uses that an additional servitude is deemed to be placed upon these implied easements and a taking can be found. The question before us, then, is whether the erection of sound barriers along an interstate in an effort to reduce the noises flowing from that interstate is a proper street use.

█ The sound barriers complained of in the instant case were constructed pursuant

to legislative direction. Minn.Stat. § 161.-125(1) (1980) provides that "the commissioner of transportation shall * * * implement sound abatement measures * * * whenever the noise level attributable to vehicular traffic * * * is in excess of the federal noise standards." The purpose of the sound barriers is to minimize at least one of the deleterious effects of using the highway as a highway, which is the level of noise engendered by increased traffic. Their presence does not facilitate the movement of vehicles, but it did result from vehicular use of the highway. We find that the construction of sound barriers is a proper street use.

The sound barriers are no less a proper street use because the abutting landowners are benefitted by the barriers. The primary purpose behind the construction of the sound barriers was to ensure that the state's operation and the public's use of the highway are in compliance with federal regulations concerning noise pollution. That the abutting landowners reap a benefit from the sound barriers does not transform the nature of the project from a proper street use to a perversion of the street, from a public use to a nonpublic one. Counsel for respondents stated at oral argument that the possibility existed that, had the sound barriers not been constructed, his clients might have had a cause of action in inverse condemnation due to the level of noise produced by the vehicles using the highway.[2] It would be anomalous for this court to hold that an alteration in the highway to reduce its noise is a perversion of the highway when failure to effect that change might well result in a finding that the state has taken the abutting landowners' properties for a public purpose, the operation of a highway, by not checking the noise attributable to the highway. Because an additional servitude has not been placed on respondents' easements, there has been no taking of respondents' easements.[3]

■ 2. Even where we find that the construction of sound barriers is not a proper street use, we would still reverse the trial court's order, for the respondents did not meet the test set out by this court in *Alevizos v. Metropolitan Airports Commission*, 298 Minn. 471, 216 N.W.2d 651 (1974). There we stated that:

> The test * * * that we prescribe will give relief to any property owner who can show a direct and substantial invasion of his property rights of such a magnitude he is deprived of the practical enjoyment of the property and that such invasion results in a definite and measurable diminution of the market value of the property.

*Id.* at 487, 216 N.W.2d at 662. Only when these two factors are proved: (1) substantial invasion of a property right; (2) resulting in definite and measurable diminution in market value, can it be said that a taking has occurred.

**2.** Counsel made clear in his presentation that his clients would not have brought such an action.

**3.** The United States Supreme Court considered a question similar to the one here presented in *United States v. Twin City Power Co.*, 350 U.S. 222, 76 S.Ct. 259, 100 L.Ed. 240 (1956). That case involved a suit by the United States for condemnation of land owned by Twin City Power Company. The question presented was one of valuation. The landowner sought a value in the flow of a stream over its property. That stream was subject to the government's "dominant servitude," its navigation easement which allowed the government to cut off the landowner's subservient interest when necessary to promote the public good. In holding that value should not be placed on the flow of the stream, the Court stated:

> If the owner of the fast lands can demand water-power value as part of his compensation, he gets the value of a right that the Government in the exercise of its dominant servitude can grant or withhold as it chooses. The right has value or is an empty one dependent solely on the Government. What the Government can grant or withhold and exploit for its own benefit has a value that is peculiar to it and that no other user enjoys. Cf. *U. S. ex rel. T. V. A. v. Powelson*, 319 U.S. 266, 273 *et seq.* [63 S.Ct. 1047, 1051, 87 L.Ed. 1390]. To require the United States to pay for this water-power value would be to create private claims in the public domain.

350 U.S. at 228, 76 S.Ct. at 263. *See also Sauer v. New York*, 206 U.S. 536, 27 S.Ct. 686, 51 L.Ed. 1176 (1906).

In this state, the question of whether a taking has occurred is one for the trial court to answer. *Alevizos, id.* at 484, 216 N.W.2d at 660. When the trial court is satisfied that both factors have been proved, a writ of mandamus is issued to require the appropriate authority to institute condemnation proceedings. Here the trial court issued such a writ. That writ should not have been issued; the petitioners did not show that their properties had suffered a definite and measurable diminution in market value.[4]

To meet the second prong of the *Alevizos* test, it is not necessary to prove the actual amount of damage caused to the property as a result of the alleged taking. Neither is it necessary to place a fixed percentage of diminution on the property's market value. That determination is for the court appointed commission, which has the responsibility of deciding what compensation would be just. To satisfy the *Alevizos* test, all the petitioner need show is that his property has suffered a diminution in property value as a result of the invasion of a property right and that that diminution is definite and measurable. The petitioners failed to do that in the case at bar.

The trial court had only the following evidence before it concerning diminution in market value: Peter Patchin, a well-known appraiser, testified for the petitioners. At their request, he performed a resale analysis to aid him in discerning whether a diminution in market value had occurred. A resale analysis is a comparison between the resale value of properties subject to the complained of interference with other properties that are free of that interference. Once the subject homes and similar unaffected homes are selected for inclusion in the study, the appreciation rates for the homes are determined by comparing the market value of the homes before the interference began with their market value after the interference became manifest.[5] The

difference in these two values results in the rate of appreciation. Finally, the rate of appreciation of the subject homes is compared to the rate of appreciation of the similarly situated homes to determine the effect on market value caused by the interference.

In the instant case, Mr. Patchin was able to locate only one home in the respondents' neighborhood that met the criteria for inclusion in the study. He then compared the rate of appreciation for that home with the average rate of appreciation for a Minneapolis neighborhood. He determined that the rate of appreciation for the subject home lagged behind that of the Minneapolis neighborhood by 40%.

Based on this study, Mr. Patchin concluded that it was probable that the respondents' properties had suffered a diminution in market value. He could not state that the properties had definitely suffered a diminution in property value, only that such diminution was probable and that he believed that the market value would bear out this prediction in a year or two. The following excerpts from his testimony are particularly illustrative on this point.

Q  Now, do you have an opinion as to whether or not this interference has been the cause of the definite and measurable diminution of the market value of petitioners' property?

A  I do.

Q  What is your opinion?

A  My opinion is that it is quite probable that there has been a measurable and substantial diminution of value * * *.

> *    *    *    *    *    *

A  Now, it will take a lot more of these comparables and a lot more analysis to really nail it down where I can say I am sure.

> *    *    *    *    *    *

---

4.  We do not comment upon whether the loss of approximately 1 hour of sunlight per day is a substantial invasion of property right.

5.  Therefore, for a home to be included in this analysis, the home must have been sold to one purchaser prior to the inception of the interference and then resold after the interference began.

Q  And the two sales prices to the one sale you have indicated a 40 percent difference; is that correct?

A  Correct.

Q  You never did put that into terms of indicating your opinion of the decrease in fair market value of the subject properties, did you?

A  No.

Q  Again, this is because from your experience you cannot—one sale does not make a market?

A  That is right.

\*　　\*　　\*　　\*　　\*　　\*

██  While a petitioner in an inverse condemnation action need not prove with exactitude the value lost, he must prove with certainty that a loss has occurred. That has not been done in the case at bar.[6]

Reversed.

WAHL, Justice (dissenting).

I respectfully dissent from the conclusion that construction of sound barriers which impair abutting landowners' interests in air, light and view is a proper street use. I would find also that the affected landowners in this case have met the requirements of *Alevizos v. Metropolitan Airports Commission*, 298 Minn. 471, 216 N.W.2d 651 (1974) to establish a taking for which they may be compensated.

The determination of what constitutes a proper street use has been made by the court on a case-by-case basis in the past. In *Cater v. Northwestern Telephone Exchange Co.*, 60 Minn. 539, 63 N.W. 111 (1895), we expanded the concept of proper street use

from transportation of people and property to include the transmission of communication by telephone lines. We recognized that the laying of sewer, gas, water and other utility lines was within the basic purpose for which public ways were dedicated. In all cases where we have determined "proper use" of a street or highway, the uses have served the general public and involved the transmission or transportation of people, goods or utility services. *Willis v. Winona City*, 59 Minn. 27, 60 N.W. 814 (1894) (construction of bridge approach which radically increased street grade held a proper street use); *McCarthy v. City of Minneapolis*, 203 Minn. 427, 281 N.W. 759 (1938) (construction of bridge for street railway car service held a proper street use); *Cater v. Northwestern Telephone Exchange Co.*, 60 Minn. 539, 63 N.W. 111 (1895) (placing telephone poles at 170-foot intervals in rural area held a proper street use).

"The public use cannot lawfully go beyond, but must be confined within, the purposes for which the easement was granted by or acquired from the original owner of the soil." *Carli v. Stillwater Street Railway & Transfer Co.*, 28 Minn. 373, 375, 10 N.W. 205, 205 (1881). Where the use is not a proper street use and it unreasonably impairs the special easement of abutting landowners an additional servitude is placed upon the landowners' easements, and a taking should be found. The sound barriers in question were not constructed to serve the general public, nor do they facilitate the transmission or transportation of people, goods or utility services. They were constructed to benefit a specific group of people—landowners facing the freeway.[1] Un-

---

6.  The study performed in the instant case was deficient in several material respects. First, there was no control for the effect on the rate of appreciation caused by the property's location near a highway; the Minneapolis neighborhood to which the sale in respondents' neighborhood was compared does not border on a highway. Second, the sound barrier had not been completed at the time the home in respondents' neighborhood had been sold. Third, there was no testimony offered as to the condition of the subject home at the time of resale, the manner in which the sale was effected, nor was there testimony as to the similari-

ties between respondents' neighborhood and the Minneapolis neighborhood chosen as a comparable.

1.  The majority opinion reasons that it makes no difference that abutting landowners are benefited by the barriers, since the primary purpose behind the construction of the sound barriers was to ensure that the state's operation and the public's use of the highway are in compliance with federal regulations concerning noise pollution. The state may well be concerned with compliance with federal regulations, but the state has no power to impose a

fortunately, they have created a far greater detriment to the interests of these abutting landowners. Just as we found a commercial railroad which was not a benefit to the general public to be an improper street use, *Adams v. Chicago, Burlington & Northern Railroad*, 39 Minn. 286, 39 N.W. 629 (1888), here too the purpose of the sound barriers does not serve to benefit the general public and thus does not constitute a proper street use.

This is not to say that construction of all sound barriers will result in a taking requiring compensation. The dual test we have set out in *Alevizos* requires that the abutting owner show a direct and substantial invasion of his easements of air, light and view and that the invasion result in a definite and measurable diminution in market value of the property interest.

The first showing, of a substantial invasion of a property interest, is similar to what we required in *Cater*, an "unreasonabl[e] impair[ment of] the special easements of abutting owners." 60 Minn. at 546, 63 N.W. at 113 (telephone lines found a proper street use). In *Cater*, we noted that rural telephone poles and lines did not constitute an impairment, but that in cities where 19th century technology could result in a morass of wires and poles, "the numerous wires stretched upon the crossarms frequently materially interfere with access, light and air." *Id.* at 546, 63 N.W. at 113. So, too, in the case before us the abutting owners have shown that fumes trapped by the walls have caused significant adverse impact, that sunlight falling upon their land and homes has been noticeably reduced, and that the once expansive views from their yards are now cut short by stark walls rising more than 20 feet high less than 30 yards from their homes. These abutting landowners have demonstrated a substantial invasion of their property rights.

The second showing necessary to establish a taking by an improper street use is that the use has resulted in a definite and measurable diminution of the market value of their property interest. Since it is the function of the mandamus court to establish only whether a measurable loss has occurred, and not to rule on precise value in terms of dollars and cents, it appears that the plaintiffs have sustained their burden under *Alevizos*.

The landowners have presented evidence from which a jury could find a diminution in market value. First, Peter Patchin, a well known appraiser, in answers to a hypothetical question, placed the value of the lost scenic easement at approximately $2,000 per lot. Second, he conducted a resale analysis to aid in determining whether a diminution in market value had occurred. Because of the recentness of construction of the barriers, Mr. Patchin's study was not as broad as could be desired, but he did conclude that the rate of appreciation of the subject home in his survey lagged 40 percent behind that of a comparable neighborhood's homes. The commissioner of transportation offered no rebuttal to Mr. Patchin's testimony.

This court should not be distracted by potential litigation which would follow from the granting of the landowners' petition for a writ of mandamus. In *Lamm v. Chicago, St. Paul, Minneapolis & Omaha Railway*, 45 Minn. 71, 47 N.W. 455 (1890), we did not accept this view when we continued to recognize a landowner's right to an action against a railway company which operated on a city street:

We are asked to reconsider and overrule our decision in the *Adams Case* [where we established the distinction between proper and improper uses of streets].

\* \* \* \* \* \*

The temporary evils resulting from the adoption of the rule by way of inciting

---

new servitude upon the abutting landowners' implied easement in light, air and view without the just compensation required for the taking of private property for public use. *Carli v. Stillwater Street Railway & Transfer Co.*, 28 Minn. 373, 377, 10 N.W. 205, 206 (1881). *See also Lamm v. Chicago, St. Paul, Minneapolis & Omaha Railway*, 45 Minn. 71, 75, 47 N.W. 455, 456 (1890).

litigation or unsettling titles are, we think, much overestimated, and will soon pass away.

45 Minn. at 78, 47 N.W. at 457. Here, the landowners' situation is unique because the barriers in question are both high and close to the homes. Typically, barriers of this height are much further from the homes.

For the above reasons I would affirm the decision of the district court granting a writ of mandamus.

YETKA, Justice (dissenting).

I join in the dissent of Justice Wahl.

SIMONETT, Justice (concurring specially).

I agree with Justice Wahl's dissent, for the reasons therein given, that the sound barriers are not a "proper street use"; however, I concur in the court's reversal on the ground plaintiffs' proof fails to meet the *Alevizos* test.

Proving diminution in market value is difficult, and in the nature of things it must be. Prior to the erection of sound barriers, the easement of air, light, and view was already impaired by heavy traffic, which traditionally, in my view, is a "proper street use." To compound the difficulty, the purpose and effect of the sound barriers was to alleviate this impairment by presumably lessening the noise, perhaps aggravating the fumes, and exchanging one scenic view for another (a view of Interstate 35W for a view of the barrier). Consequently, to show a diminution in market value, something more than Mr. Patchin's opinion, which was both speculative and lacking in foundation, is needed to compel the state to condemn.