186 N.J. Super. 587 (1982)
453 A.2d 284
ANTHONY J. BARILE AND SYLVIA J. BARILE, HIS WIFE; GEORGE E. KLIMA AND VALERIE KLIMA, HIS WIFE; AND FRANK CREVELING AND ANNE R. CREVELING, HIS WIFE, PLAINTIFFS,
v.
CITY OF PORT REPUBLIC, A MUNICIPAL CORPORATION OF ATLANTIC COUNTY, NEW JERSEY, DEFENDANT.
Superior Court of New Jersey, Law Division Atlantic County.
September 17, 1982.
*588 Leland A. Stanford, for plaintiffs Barile (Stanford & Bruce, attorneys).
Joseph Gindhart for plaintiffs Klima (McGahn, Friss, Gindhart & Miller, attorneys).
D. William Subin for plaintiffs Creveling (Subin, Armstrong & Armstrong, attorneys).
James J. Gruccio for defendant (Tuso, Gruccio, Pepper, Buonadonna, Giovinazzi & Butler, attorneys).
*589 MILLER, EDWARD S., J.S.C.
This prerogative writ action raises the spectre of a conflict between the official map adopted by a municipality pursuant to N.J.S.A. 40:55D-32 et seq. and public and private rights in streets or roads not included on such map. The facts giving rise to this controversy are quite simple. The City of Port Republic lies on the south shore of the Mullica River in Atlantic County. It is a rural community having a population in 1980 of 850 and an area of eight square miles. It is one of the older communities in Atlantic County, having been cut out of Galloway Township in the early 1900s. While it is predominantly rural in nature, it straddles the Garden State Parkway, has two interchanges within its borders, is likewise traversed by U.S. Route 9, a heavily travelled highway and is about ten miles north of Atlantic City. There are 6.8 miles of roads shown on the official map and an unknown number of unrecognized roads in addition. It is, in short, in a state of development which cries out for careful, prudent and farsighted planning.
On June 12, 1979, in compliance with N.J.S. 40:55D-32, and after the appropriate gestatorial measures, such as review by the planning board, the governing body adopted an official map. While at the outset of this case plaintiffs assailed the procedural process, this was abandoned at the opening of the trial and the case proceeded upon the theory of the impact of the map upon public roads in the city.
The city takes the position that only those streets shown upon the map are to be considered public streets. Plaintiffs, three married couples, own lands and buildings which front on roads alleged by them to be public roads. It is their contention that the adoption of the official map cannot, in itself, act as a vacation of the roads not included thereon. Rather, it is their position that the vacation of a public right of way can only be done by ordinance pursuant to N.J.S.A. 40:67-19. The issue thus narrows and distills.
*590 The issue of private and public roads has presented troubling problems to governing bodies for years. Plagued by the increased demands of property owners, and thus taxpayers (and voters), to repair or at least maintain or improve a particular road equally plagued with the administrative demands of municipal finance, particularly the "Caps" law, N.J.S.A. 40A:4-45.3, governing bodies have stood in uncertainty as to what they could or could not do to placate their concerned residents without committing the municipality to long-term and expensive course of improvements.
The typical approach to the street problem is presented by the question of rights of the public to a given road, or, conversely, the rights of neighboring property owners to passage or repassage. From these problems have developed well known principles, such as the necessity to dedicate, Price v. Plainfield, 40 N.J.L. 608 (E. & A. 1878); Methodist Episcopal Church of Hoboken Trustees v. Hoboken, 33 N.J.L. 13 (Sup.Ct. 1868); acceptance by user, Booraem v. North Hudson Cty. Ry. Co., 39 N.J. Eq. 465 (Ch. 1885); Point Pleasant Land Co. v. Cranmer, 40 N.J. Eq. 81 (Ch. 1885); the rights of the public when a developer sells lots from a map, Point Pleasant Land Co. v. Cranmer, supra. See 2 Walsh, Commentaries on the Law of Real Property, c. 33, p. 746 ff. The definitive treatment is, of course, to be found in Cunningham and Tischler, "Dedication of Land in New Jersey," 15 Rutg.L.Rev. 377-413 (1961).
In the instant case plaintiffs are three families, each living on a road alleged by them to be a public road not included on the official map. The city claims, first, that the roads are private roads and, next, that if they were public roads, their exclusion from the official map operates as a vacation of such roads. The concept of an official map is of relatively recent origin in this State.
Prior to the enactment in 1953 of the Official Map and Building Permit Act, N.J.S.A. 40:55-1.30 et seq., the subject of filed maps was governed by the Old Map Act, R.S. 46:23-1 et *591 seq. This statute, originally part of the Conveying Act of 1898, L. 1898, c. 232, was intended to provide a method for officially filing maps and to delineate sound engineering standards for maps so filed, Lake Intervale Homes, Inc. v. Parsippany-Troy Hills, 28 N.J. 423, 433 (1958); Loechner v. Campoli, 49 N.J. 504, 510 (1967). The repeal of the Old Map Act and the substitution therefor of the New Map Act now contained in N.J.S.A. 40:55-1.30 et seq. constituted merely a "state of the art" updating the technical requirements, not a change in the scheme. R.S. 46:23-9.13 contains a provision that the approval of a map shall not constitute acceptance of roads, streets or by-ways shown therein.
In 1930 the first New Jersey planning statute was passed. L. 1930 c. 235. While it differs from our present statute as the bud from the flower, the schematic appears therein. Under its provisions the governing body of a municipality was empowered by § 7 to establish, by ordinance, the master plan, either in whole or in part, as the official map of the municipality. This was to be deemed "official and conclusive" with respect to the location, width and certain other characteristics of the roads and streets therein. See Cunningham, "Control of Land Use in New Jersey Under the 1953 Planning Statutes," 15 Rutg.L.Rev. 1, 2 (1960).
In 1953 the Legislature carved out the official map concept from the generality of the master plan itself into a specific map, L. 1953 c. 434, R.S. 40:55-1.30. While it has been rewritten in the Local Land Use Law, its salient features are retained, N.J.S.A. 40:55D-32 et seq. It reads as follows:
40:55D-32. Establish an official map
The governing body may by ordinance adopt or amend an official map of the municipality, which shall reflect the appropriate provisions of any municipal master plan; provided that the governing body may adopt an official map or an amendment or revision thereto which, in whole or in part, is inconsistent with the appropriate designations in the subplan elements of the master plan, but only by the affirmative vote of a majority of its full authorized membership with the reasons for so acting recorded in the minutes when adopting the official map. Prior to the hearing on the adoption of any official map or any amendment thereto, the governing body shall refer the proposed official map or amendment to the planning board pursuant to subsection 17a. of this act.

*592 The official map shall be deemed conclusive with respect to the location and width of streets and public drainage ways and the location and extent of flood control basins and public areas, whether or not such streets, ways, basins or areas are improved or unimproved or are in actual physical existence. Upon receiving an application for development, the municipality may reserve for future public use, the aforesaid streets, ways, basins, and areas in the manner provided in section 32.
40:55D-33. Change or addition to map
The approval by the municipality by ordinance under the provisions of any law other than as contained in this article of the layout, widening, changing the course of or closing of any street, or the widening or changing the course of or closing of any street, or the widening or changing the course of any public drainage way or changing the boundaries of a flood control basin or public area, shall be subject to relevant provisions of this act.
It is further provided that no present street be used for a building or structures in the bed of any such street.
The city, from the statement in 40:55D-32 that the map "shall be deemed conclusive" with respect to the location and width of public streets, advances the argument that since this is so, it must necessarily follow that no other street or road can exist  hence, any such road or street must be cancelled or vacated by reason of the adoption of the official map.
Not so.
In the first place, it is clear that the thrust of the official map is prospective, looking forward to the future growth of the municipality. Its aim, as shown in the sections quoted, is to provide for the orderly and rational development of the traffic circulation network of the municipality and to preserve the integrity of such network by insuring that the planning goal would not be frustrated by haphazard construction of buildings and structures in the bed of any road or street on the map. It was the intent of the framers of the act that it be prospective and not retrospective.
First, it is significant that upon the adoption of both the original Official Map Act, N.J.S.A. 40:55-1.30 and its revision in the Land Use Act, N.J.S.A. 40:55D-32, the Legislature left unscathed the statutory provision for the vacation of streets, R.S. 40:67-19. This section requires vacation of public streets *593 by ordinance and is superfluous if vacation can be done in a backhanded manner by adoption of an official map.
Second, it is at least questionable if the Legislature could validly provide for such an arbitrary manner of vacation. While the existence and location of streets and roads may be easily ascertainable by casual inspection, on maps and surveys, no such procedure is available to determine the ownership of land abutting such streets and roads save a search of the titles to all adjoining lands.
Public highways become public highways because of dedication and acceptance. The modes of dedication are many and varied. The public roads in this State derive from not only formally dedicated, accepted and plotted streets but from such other sources as Indian trails, roads found to be in existence prior to 1760 (and thus four-rod roads, see Parsippany-Troy Hills v. Bowman, 3 N.J. 97 (1949)) and countless other roads whose existence is taken for granted.
Moreover, it is patent that the exact number and extent of public roads is not known and probably never will be. From the testimony in this case it develops that the City of Port Republic contains 8 square miles; that the official map recognizes 6.8 miles of roads as public roads as set forth on the map, and that 9.5 miles of "dirt roads" are conceded to exist. In other words, out of a total of 16.5 miles of roads, only 42% are admittedly public. To ask a court to adopt the thesis that the remaining 58% become automatically classified as private roads and by this fiat radically affecting the rights of all property owners abutting those roads is indeed a drastic step. It is one this court declines to take.
It follows therefrom that it is, in practice, impossible to state with any degree of certainty the status of a large percentage of the roads in this State. Since this cannot be done, it is not possible to delineate which roads are public and which are private. That the owners of adjoining properties have significant and constitutionally protected rights by virtue of such *594 ownership is obvious. Sauer v. N.Y., 206 U.S. 536, 27 S.Ct. 686, 51 L.Ed. 1176 (1906); 10 McQuillin, Municipal Corporations, § 30.54 at 714 et seq.
It is, therefore, the holding of the court that the adoption of the City of Port Republic of the official map was inoperative with respect to the existing roads and streets in the municipality, which remain unaffected thereby.
This decision, however, does not imply that all nonincluded streets are private or public, nor does it imply that the municipality is obligated to maintain any or all roads within its boundaries. Indeed, it is the holding of the court that municipalities do not bear such a burden but that each road alleged to be a public road must be evaluated as to its status. For this purpose a "public road" is defined as a road in which the public possesses rights of passage or repassage; a "public highway" is defined as a public road accepted as a public highway by the proper governmental unit and which it is obligated to maintain. Thus, not every public road was a public highway.
While it would be inappropriate to review the history of this State from the grant of Charles II to his brother, James, Duke of York, on March 12, 1664 (N.J.S.A. "Validating Acts" at XXXIX et seq.), it is not irrelevant to point out that at that time, and for many, many years thereafter, what is now New Jersey was unoccupied save for a comparatively few settlers; that there was neither obligation nor necessity to lay out and dedicate highways and that the comparative growth from then to now is nothing short of stupendous. Little imagination is needed to visualize Indian trails and cow paths expanding and growing. Witness Boston or downtown New York.
From shortly after the settling of this province the problem appears to have been recognized and addressed. We are told by Chief Justice Kirkpatrick, in Ward v. Folly, 5 N.J.L. 483 (566), 484 (568) (former Supreme Court 1819) that the first statute respecting a cataloguing of roads and road return was passed in 1682 and that other and similar acts were passed in 1716, 1758, *595 1760 and 1774. The thrust of these statutes is to direct that roads be tabulated and, if necessary, laid out by overseers of highways, to set forth standards as to the width of said roads and requiring that these be registered in each county in a road book. These books are still being kept in each county. See, also, Mendham v. Losey, 2 N.J.L. 327 (former Supreme Ct. 1808), on the duty to repair.
That this is more than of academic interest is manifested by the fact that the statutory scheme was the dispositive issue in Parsippany-Troy Hills v. Bowman, 3 N.J. 97 (1949). In that case the question of the width of a certain highway depended on whether it could be proved that it had been in existence prior to 1760. Justice Burling referred to and followed Ward v. Folly, supra, and these two cases stand today for the principle that all roads in this State proved to be in existence prior to the act of 1760 are, by that statute, deemed and taken to be four-rod roads.
The statutory requirement is significant in this case, not with respect to the width of the roads but as evidencing the continuous policy of the Legislature that only those roads which are so tabulated are those which the public body might be obligated to maintain. In that respect the present land use law requirement as to the standards of proposed streets contained in new subdivisions, N.J.S.A. 40:55D-7, as well as the prospective thrust of the Official Map Act are linear descendents of the colonial scheme. A similar linear descendent may be found in our Highway Authority Act, N.J.S.A. 27:12B-1 et seq. See New Jersey Highway Auth. v. Drenth, 44 N.J. Super. 327 (Law Div. 1957). Given the policy of recordation, or registration, of public highways, what is the status of those roads in which the public has right of passage and repassage but which are not so registered? These are the relics of three centuries of development, the vermiform appendices of our traffic circulatory system. It is they which haunt all governing bodies with spectres of bankruptcy.
*596 In Stevens v. Allen, 29 N.J.L. 68 (former Supreme Court 1860), aff'd 29 N.J.L. 509 (E. & A. 1861) Justice Ogden stated:
The legislature of this state recognizes three classes of ways; and in tracing down their enactments on the subject of roads from 1716 to the date of the approval of the present act concerning roads, they will be found to have treated only of those three classes, to wit, public roads, private roads, and by-roads. The two former can be created by proceedings under legislative regulations, while the latter is assumed to have been created by grant, or in some other mode in which title to a private way is acquired. A by-road is defined by Worcester to be "an unfrequented path, an obscure road."
And one year later, in Van Blarcom v. Fribe, 29 N.J.L. 516 (E. & A. 1861), Justice Kennedy laid it out plainly:
... It appears from the evidence that defendant and others have been traveling over plaintiff's land for more than thirty years, in one particular road, without permission or protest from any of the owners. The land consisted of three fields, and four pair of sliding bars were on the line of the road on plaintiff's land.
The first question is, was it a private way? It was not claimed or used by any one individual. It was used by all who wanted to haul logs from the mountain to Van Blarcom's saw mill. It was used by all who wanted to cross the mountain through the gap, and go to the village of Oldham. Was it, then, a private way? The defendant so claims in one of his pleas; and these facts should have been left to the jury to decide. Our statute recognizes three different roads, a public road, a private road, and a by-road. It was not a public road. There is no evidence that it had ever been laid out by surveyors, therefore it was not a private road previous to the action of the freeholders. It can only be a by-road, such as is recognized by the road law, in the 19th section. A by-road is a road "used by the inhabitants, and recognized in our statute, but not laid out." They are often called drift-ways. They are roads of necessity in newly-settled countries Individuals locate some distance from a public road. They make a by-road to the nearest public road. In process of time other individuals locate between them and the highway and the land is cleared, but the road is continued, and the owner of the cleared lands places sliding bars at the outside of his enclosure and on the line of the by-road, and they continue to use their road for thirty or forty years ... [at 517-518]
And in Perrine v. Farr, 22 N.J.L. 356 (former Supreme Ct. 1850), referring to a statute dealing with roads, Chief Justice Green wrote:
... At the time of the original adoption of this provision there were in this state many by-roads, extending from plantation to plantation, which had never been laid out agreeably to law. Public roads were comparatively rare. As the country became settled, many dwellings were erected remote from public highways, and resort was had to by-roads, extending over adjoining plantations, for the convenience of the inhabitants. But in many cases these roads were permissive merely. They had not ripened into right.... [at 368]
*597 And in more modern times, Judge (later Justice) Haneman, in Lower Tp. v. Reeves, 14 N.J. Super. 180, 184, 186 (Ch.Ct. 1951), and referring to the road which was the subject of that suit said:
... For upwards of 75 years Weeks Landing had been used by the citizens and inhabitants of Lower Township for the conduct of fishing, clamming, oystering and hunting ...
In any event, the construction of a swing gate prior to 1918 is not inconsistent with plaintiff's contention that this was a public highway. The road in question was of such a nature as would in the earlier days of the history of this State have been designated a by-road or private road. Such roads were obscure or neighborhood roads, not used to any great extent by the public, yet were so far a public road that the public had of right free access to them at all times. Under the authority of Revision of 1877, page 1001 et seq., until the same was repealed by L. 1918, chapter 190, page 652, the defendants' predecessors in title had the right and authority to construct a swinging gate across such a road, although it was dedicated to the public. Such construction was not, of necessity, an act of dominion over the land under claim of title. Wood v. Hurd [34 N.J.L. 87] [(Sup. Ct. 1869)], supra; Tarlucki v. West Jersey & S.R.R. Co., 82 N.J.L. 138 (Sup.Ct. 1911); Perrine v. Farr, 22 N.J.L. 356 (Sup.Ct. 1850); Speer v. Erie Railroad Co., 68 N.J. Eq. 615 (E. & A. 1904); Stevens v. Allen, 29 N.J.L. 68 (Sup.Ct. 1860), affirmed 29 N.J.L. 509 (E. & A. 1861).
The conclusion is that there were in this State three classes of roads; namely, (1) Public highways, (2) By-ways, (3) Private roads. Of these three the duty of public maintenance was imposed only on the first class, public highways. As to the second class, no duty of maintenance was imposed but the public had the right of passage and repassage. As to the third, the public had no such rights.
It thus becomes necessary to examine each of the three roads in this case to determine in which class each lies.
The by-road seems to have disappeared from our cases over the past one hundred years, thus leaving the status of such roads in limbo. While it would be fascinating to test each such road as to its present status, it is neither necessary nor practical to do so. It does, however, become necessary to test each of the three roads in this case as to its status, both as to dedication and acceptance, to see if each was, or is, a public road. The thrust of this test, from the testimony elicited at the trial, will necessarily *598 direct towards acceptance. See Cunningham and Tischler, "Dedication of Land in New Jersey," 15 Rutg.L.Rev. 395-399 (1961).

I  Poulson's Road
Plaintiffs Barile advance the proposition that the land upon which they live, Poulson's Road, is a public highway, bottomed upon occasional use by the public, call points in deeds and a few occasions when gravel was thrown on a portion of the road. Without summarizing the testimony, the court holds that the proofs fell far short of that which is required by establishing both dedication and acceptance as a public road. It is, therefore, declared to be a private road.

II  Blight's Lane
Both Poulson's Road and Blight's Lane really lead back to the same large field. The testimony elicited on behalf of this road so closely parallels that of Poulson's Road that the same principles apply. It, too, is a private road.

III  Shell Landing Road
A much different situation exists with respect to Shell Landing Road, the road whereon reside plaintiffs Klima. The proofs revealed that this road had been in use probably since colonial times, had many different owners of lots fronting thereon and had formerly been used to gain access to Nacot Creek and a shipyard at the river end of the road. Moreover, it was clear from the testimony that the municipality had periodically improved this road to such a degree that its acceptance as a public road must be found to exist. It is, therefore, declared to be a public road and shall be shown as such on the official map.
While it is only tangentially before the court in this case, it may head off future litigation to point out that the acts of municipal officials in granting subdivision approvals, building permits, etc., while not binding on the city as an admission of the nature of the road, might well give rise to an estoppel in the event that the owners of the properties declared herein to be *599 private roads, desire to construct improvements at a later date. N.J.S.A. 40:55D-36 seems so clearly designed to handle such cases that it might very well be successfully argued that a denial of a permit under such circumstances would clearly constitute an abuse of discretion.