887 A.2d 738

BOROUGH OF MILFORD, PLAINTIFF, v.
WALTER ARNOLD, DEFENDANT.

Superior Court of New Jersey
Law Division Hunterdon County

Decided August 26, 2005.

*John H. Rittley*, for plaintiff.

*Gaetano M. DeSapio*, for defendant.

BUCHSBAUM, J.S.C.

## FACTS

### Scope Of The Dispute

This is a condemnation case. The Borough of Milford has taken an easement for road purposes along what is known as Railroad Avenue in Milford Borough. Originally it sought to condemn 5,296 square feet on Block 15, Lots 1, 10 and 11. After initiating the condemnation action on December 9, 2002, the Borough did further research and determined that deeds in 1867 and 1893 already provided public rights in some of the proposed Railroad Avenue right-of-way. For that reason, the Borough revised the condemnation map on May 9, 2003, and, by leave granted, amend-

ed its complaint to decrease the proposed taking in Block 15 by 2,949 square feet from 5,296 square feet to 2,347 square feet. The changes were as follows:

| BLOCK & LOT | ORIGINAL | REVISED |
|---|---|---|
| Block 15, Lot 1 | 1,932 square feet | 646 square feet |
| Block 15, Lot 10 | 809 square feet | 0 square feet |
| Block 15, Lot 11 | 2,555 square feet | 1,701 square feet |
| **TOTAL** | **5,296 square feet** | **2,347 square feet** |

In addition, the Borough sought to condemn defendant's rights in a parking easement on Block 14, Lot 16. The amount of such condemnation is asserted to be only 550 square feet. This property was not included in the original condemnation.[1]

This dispute accordingly involves approximately 4,000 square feet, or less than one-tenth of an acre. In addition, the 5,296 square feet originally proposed to be condemned by the Borough was valued by the Borough at $2,500. The Borough now proposes to acquire 2,347 square feet from Arnold directly, plus 550 from the easement on Block 14, Lot 16, for a total of approximately 2,900 square feet. Arnold claims the total should be approximately 5,296 square feet from him, and about 1,500 feet for the easement, for a total of 6,800 square feet versus the 2,900 square feet sought by the Borough.

Nonetheless, this approximately 4,000 square foot dispute involving property apparently without a large value, has already consumed parts of five court days. The court heard openings on this issue on May 3, and conducted trial on June 3, 17, and 29, and

---

[1] The original size of the easement thought to be required on Block 14, Lot 16 is not clearly set forth. From the visual inspection of Exhibit Q–2, which shows the differences between the full right-of-way and what the Borough claimed is covered by public rights, it would appear that an area of easement on Block 14, Lot 16 in total would be 1,500 feet, with the Borough claiming that 1,000 feet of that is already dedicated to the public. The scope of the original and current condemnations are depicted in Exhibit Q and two overlay maps, Q–1 and Q–2, all of which were part of Joint Exhibit 2.

also on July 1. The entire proceeding is only a prelude to the ultimate appointment of Commissioners to determine the value of whatever property, 6,700 square feet or 2,900 square feet, the Borough needs.

In its proofs the Borough essentially relied on two deeds with respect to Block 15, Lots 1, 10, and 11. One deed is recorded at Book 136, Page 740, and is dated March 29, 1867, and recorded August 6, 1867. The next deed in that chain was recorded in Book 176, beginning at Page 550, and is dated March 10, 1869, but was not recorded for some reason until May 13, 1878.

With respect to Block 14, Lot 16, there is almost equally venerable deed recorded in Book 235, beginning on Page 242. That deed is dated January 16, 1893, and was recorded on January 17, 1893.

There was no dispute as to the scope of property covered by these deeds, that is, the square foot totals set forth above. The dispute is to whether the deeds effectively dedicated the property and, if so, whether any dedication was either never accepted or abandoned.

### *History of the Dispute Over the Easement*

The controversy arose when Arnold sought to develop his property using an informal procedure the Borough had, which was routine in minor applications. However, the Planning Board ultimately resolved, after considerable discussion contained in D–27, on February 23, 2001, that Railroad Avenue was not a street along which development would occur and that Arnold needed variances. Rather than appealing this decision, Arnold then discussed the matter with the Borough Council which likewise agreed that Railroad Avenue was not a Borough road. As a result, Arnold then attempted to bill the Borough for the use of his property for a sewer line that had been installed in the 1960s. When the Borough refused to pay, he threatened to close off Railroad Avenue.

Having been provoked by this somewhat predictable assertion of rights in Railroad Avenue, the Borough went to court seeking to enjoin such closing. It argued in its application, among other things, that it had prescriptive rights in Railroad Avenue. It also argued that Arnold's assertion of property rights would deprive the Borough of access to its sewer plant. During the course of these proceedings, and in this proceeding, Arnold raised the issue that the Borough authorities had refused to enforce certain traffic/trespassing laws on his property because it was private property.

As a result of the earlier litigation, which was entitled *Borough of Milford v. Arnold,* Docket No. *HNT–C–14031–01,* the parties entered into an agreement, D–23 in evidence, in which the Borough agreed "to acquire/condemn parcels comprising Railroad Avenue the public roadway which would provide the Arnold property with road frontage". See Settlement, ¶ 5A. The heart of the settlement thus appears to be the Borough's agreement to condemn Railroad Avenue on the one hand, and second, that such condemnation would provide street frontage for Arnold's proposed development. In this way, the Planning Board's determination that Arnold lacked road frontage for developing his property would be negated. However, nothing in the Settlement Agreement stated the exact parcel to be condemned. It was sufficient in the agreement that the condemnation result in the functional provision of a roadway by Arnold's property that would qualify as a street for zoning purposes.

This settlement ultimately resulted in the instant condemnation action.

### *Dedication*

 While the Borough first, as noted above, condemned the entire right-of-way, it later reversed course, and, based on new survey/title information, limited the amount of condemnation as described above. In addition, the Borough, after the initial condemnation, determined that it had to acquire some rights from

Arnold in Block 14, Lot 16, since he had a parking easement. However, in its revised posture, it only required 550 square feet of the parking easement.

The Borough's position is based on essentially three deeds which have been previously recounted. With respect to Block 15, Lots 1, 10, and 11, the 1867 deed contained the following:

> Being subject to a street on the front or first line thereof and also to a lane or alley along the north side thereof on the second line or course of twelve feet in width, four feet whereof is to be taken from the lot hereby conveyed and eight feet from the lots adjacent which said street and alley are to be kept open for the free and perpetual use of the public.
>
> [See Exhibit O included in Joint Exhibit J2 in Evidence.]

The 1869 deed, recorded in 1878 respecting the same property, contains similar language:

> Subject to the condition of keeping open for the free and perpetual use of the public all the streets, lanes and alleys not open adjacent to the said property hereby conveyed.
>
> [1869 Deed, See Exhibit P2 in Evidence.]

Similar language was essentially set forth in the 1893 deed previously referenced.

> Subject to the condition of keeping open for the free and perpetual use of the public of a lane of twelve feet in width between the lot of George Hausel and the lot just described. Six feet whereof and to be taken from the lot just described and six feet from the lot of said Hausel.
>
> And also subject to the condition of keeping open for the free and perpetual use of the public of the street between the lot herein mentioned and the lot sold to Adam Ramsey in width one half thereof is to be taken from the lot herein described an one half from said Ramseys lot:
>
> [1893 Deed, Exhibit O in Evidence.]

Aside from these deeds, the *Beers* Atlas of 1873 suggests the actual existence of Railroad Avenue even at that time. While the Atlas itself is not evidence of boundaries and ownership of the roads, it is acknowledgment of the road's existence at that long ago time.

### LEGAL ANALYSIS

The first question for the court to determine is whether this language constitutes words of dedication. In this connection the court notes that there is nothing equivocal about the language.

The covered area is clearly described. The language admits no doubt that it is intended to grant the public certain permanent rights. This is not a case where there is an ambiguous reference to a filed map or some other lack of clarity. The fact that the area is referred to as an alley does not make it any less subject to the words of dedication. See generally, *Cunningham & Tischler, Dedication of Land in New Jersey*, 15 *Rutgers L. Rev.* 381–383, 385 (1960). As they note correctly, citing *Point Pleasant Manor Bldg. Co. v. Brown*, 42 *N.J.Super.* 297, 126 *A.*2d 219 (App.Div. 1956), and *Osterweil v. City of Newark*, 116 *N.J.L.* 227, 182 *A.* 917 (E. & A.1936), doubt should be resolved in favor of dedication. See also *Haven Homes v. Raritan Twp.*, 19 *N.J.* 239, 246, 116 *A.*2d 25 (1955). *Cunningham, Real Property*, 12 *Rutgers L. Rev.* 218, 220 (1957); and 10 *Rutgers L. Rev.* 249, 257 (1955). In any event, there are no ambiguities in this language.

▉▉▉▉ It is also basic New Jersey law that such dedication remains in effect forever until there is an affirmative act of rejection by legislative action. *Cunningham & Tischler, supra,* 15 *Rutgers L. Rev.* at 382. As stated by the court in *State of N.J. by Com'r of Transp. v. Birch*, 115 *N.J.Super.* 457, 280 *A.*2d 210 (App.Div.1971): "Notwithstanding non-acceptance, the power of acceptance remains with the public authorities until such time as they reject or vacate the dedicated land by official municipal legislative action."

*See also Highway Holding Co. v. Yara Eng'g Corp.*, 22 *N.J.* 119, 126, 123 *A.*2d 511 (1956). As the *Yara* Court further stated, after "dedication of streets to the public use, the public has the right to appropriate them at any time it wants or convenience requires ..." *Id.* at 126, 123 *A.*2d 511 Thus, "the power of acceptance continues indefinitely in the general public and in the authorities who represent the public". *Cunningham & Tischler, supra,* 15 *Rutgers L. Rev.* at 383. This has been the law in New Jersey for generations. *Osterweil, supra,* 116 *N.J.L.* at 231, 182 *A.* 917; *Tweddell v. Vill. of S. Orange*, 95 *N.J.L.* 327, 333, 112 *A.* 511

(Sup.Ct.1921). Accordingly, this court finds a permanent dedication of the areas on defendant's lands set forth in red on Q–2.

### Abandonment

■ Further, although a formal mechanism exists for abandonment of a right-of-way, see *N.J.S.A.* 40:67–19, there was never such an actual legislative act of abandonment performed in this case. The Planning Board's decision, referenced above, on a subdivision application, which simply held that the applicant file a full application, does not constitute such a formal legislative act. The Council's informal statements both in 1973 and in 2000 that it did not own Railroad Avenue are only an expression of opinion. However, such actions do not constitute a formal act of abandonment. As stated in *Osterweil, supra,* 116 *N.J.L.* at 231, 182 *A.* 917 (t)he "right of the city to accept dedication is not prejudiced by the informal acts of its agent, and can only be surrendered by the express and formal acts of the authoritative body."

■ In addition, mistakes about the scope of municipal rights cannot result in abandonment. Clearly, an error by a government official cannot give away land. That Borough officials had lost track of the 19th century deeds because grantors omitted them from the chain of title cannot prejudice the Borough. If authority for such a self-evident proposition were needed, it can be found in *Smith v. State,* 23 *N.J.L.* 130, 135 (Sup.Ct.1851) in which the former Supreme Court endorsed language which is *a propos* 154 years later: "The right of the people to a public highway cannot be lost by a mistake of the agents or servants or by their misapprehension of the right of the public."

Neither is Ordinance 672–02, for the condemnation, evidence of abandonment. As the Borough points out, that ordinance simply authorized the acquisition of such easements as were necessary to obtain rights-of-way for Railroad Avenue. It did not abandon any public rights.

█ The question then becomes whether there was ever any other acts of abandonment in fact of the street in question. In other words, has the Borough acted inconsistently with existence of an easement, or which estops it from claiming one. See, e.g., *Blank v. Haddonfield,* 96 *N.J. Eq.* 641, 126 *A.* 300 (E. & A.1924) (right of public access to a lake found forfeited when town filled lake in). As its primary evidence of same, Arnold has relied on the 1976 Official Map, the settlement contained in D–23, and the apparent encroachment to the alleged right-of-way of certain structures over a course of years. Payment of taxes has also been considered by the court.

The official map is ambiguous at best. In contrast with the tax map, in which Railroad Avenue does not appear at all, the official map, Exhibit J–3, actually shows Railroad Avenue. There is a legend which describes this particular street as "streets not part of the official Borough street system." Railroad Avenue is thus recognized as a street but perhaps not one that the Borough is obliged to maintain. The official map also contains the following note: "Exclusion from this map of any otherwise accepted municipal street or road easement or other municipal property is not to be construed as a vacation of municipal rights." *Joint Exhibit J3 in Evidence.*

Accordingly, by this note, to the extent that there was acceptance of Railroad Avenue at some point in the past, this map's not listing it as an official Borough street does not constitute a vacation thereof.

This 1976 notation anticipates the holding in *Barile v. City of Port Republic,* 186 *N.J.Super.* 587, 453 *A.2d* 284 (Law Div.1982). In that case a municipality tried to argue that it had no obligation for certain streets since they were not included on its official map. However, the Law Division, through Judge Miller, rejected that argument. Citing *N.J.S.A.* 40:67–19, it held that: "This section requires vacation of public streets by ordinance and is superfluous if vacation can be done in a back handed manner by the adoption of an official map." *Id.* at 592–93, 453 *A.2d* 284.

The Court continued: "It is, therefore, the holding of the court that the adoption of the City of Port Republic of the official map was inoperative with respect to the existing roads and streets in the municipality, which remain unaffected thereby." *Id.* at 594, 453 *A.2d* 284.

Thus, to the extent that the public had rights in Railroad Avenue, those rights are unaffected by the omission of Railroad Avenue as an explicitly municipal road on the official map. It is noted in this connection that the official map in Port Republic contained no mention whatsoever of the roads in question as contrasted with the Milford map, which does at least recognize the existence of Railroad Avenue as a street.

 Further, the settlement does not constitute an act of abandonment. It is not a legislative act. Moreover, the operative provisions of ¶5A in the settlement, cited above, merely promise to provide Arnold with a legal street. They address the evident unfairness that had existed when the Borough was on the one hand claiming the right to use Railroad Avenue but on the other hand refusing to allow Arnold to develop along it. This action on the Borough's part was unjust. However, its injustice was recognized and resolved in the Settlement Agreement, which promised Arnold a usable street for development. It thus freed him to pursue his plans for his property without running into the barrier of not being on a street. That is all the settlement does. It does not constitute a legislative action clearly and affirmatively renouncing rights in Railroad Avenue.

 Thirdly, the extensive proofs of the existence of scales on Railroad Avenue do not prove abandonment. As *Cunningham & Tischler* note, *supra,* 15 *Rutgers L. Rev.* at 401, municipal permits to maintain structures on or over public streets are ordinarily revocable. If Milford had wished to try the issue in an ejectment action or otherwise, it may well have been determined that its rights under the 1867, 1869, or 1893 deeds gave it authority to remove such scales. In fact, several municipalities have prevailed in the face of even more explicit assertion of private use, and

payment of taxes. *See, e.g., Lower Twp. v. Reeves,* 14 *N.J.Super.* 180, 81 *A.*2d 513 (Ch.Div.1951) (installation of gates); *George Van Tassel's Cmty. Funeral Home v. Town of Bloomfield,* 8 *N.J.Super.* 524, 532, 73 *A.*2d 636 (Ch.Div.1950) (forty-year use as private driveway); *Tweddell, supra,* 95 *N.J.L.* at 333, 112 *A.* 511 (taxes are annual charge for use of the property for the time being). Moreover, there is nothing in the record to suggest that the scales constituted a sufficient obstruction of Railroad Avenue as to obscure its generation's long use as a right-of-way providing access to the sewer plant, various mills, and the river. Such reasonable use of municipal rights-of-way is consistent with rights of the public, and not evidence of abandonment. *Cunningham & Tischler, supra* 15 *Rutgers L. Rev.* at 407 and cases cited at notes 177 to 183.

Accordingly, Milford's actions have not constituted an effective abandonment or vacation of a right-of-way.

### *Acceptance*

Accordingly, we come to the question of acceptance. The cases make clear beyond doubt that acceptance can occur through municipal conduct and does not require formal legislative action. As per *Cunningham & Tischler, supra,* 15 *Rutgers L. Rev.* at 396-97, "the assumption of control over the subject matter of dedication whether public authorities constitutes an acceptance" even if there is no formal acknowledgment of same. As further stated in *State v. Birch, supra,* 115 *N.J.Super.* at 464, 280 *A.*2d 210, "while generally an offer of dedication is irrevocable ... acceptance may also be effectuated by other official conduct which manifests an intention to treat the land in question as dedicated to public use." In *Birch,* acceptance was found through improvement and maintenance by the Township. *See also George Van Tassells, supra,* 8 *N.J.Super.* at 530, 73 *A.*2d 636, holding that "no particular formal acceptance of a dedication is necessary."

The relevant facts concerning acceptance are summarized in the certification of former councilman LaFevre, placed in evidence by defendant:

**1. Stop Signs**

On April 11, 1930, by Ordinance #42, the Borough installed "Stop" signs on Railroad Avenue;

**2. Lighting**

On April 14, 1941, the Borough by Resolution contracted with new Jersey Power & Light Company for the installation, operation, and maintenance of five (5) 100 candle power overhead lighting fixtures for Railroad Avenue;

**3. Road Sign**

On March 11, 1942, the Borough contracted with Ready Made Sign, Co., of New York, New York for street name sign for "Railroad Avenue". This sign was later replaced on August 8, 1961 as the result of damage.

**4. Water Line**

On November 30, 1943 as part of the Borough's overall capital improvements, the Board of Chosen Freeholders of Hunterdon County approved a water line project to the installation of a six inch water line in Railroad Avenue from Bridge Street to Walnut Street with connections to all intersecting streets to increase the volume of supply;

**5. Addition to street network; replacing of road sign**

On March 10, 1958, by Ordinance, the Borough established pursuant to then *N.J.S.* §§ 39:4–140 and 39:4–197 Railroad Avenue as a through street of the Borough, on or about July 14, 1958, that ordinance was amended to indicate Railroad Avenue as a through street "from the south side of Bridge Street to its dead end to the south ..." It was at this point, that the Borough actually assumed exclusive control and dominion over the roadways as then Penn–Central Company, the owner of the railway, stopped any involvement in Railroad Avenue with regard to maintenance or upkeep. At that time, Railroad Avenue was an improved roadway and is not vacated or undisclosed and the Borough's use of it was customary and daily; In or about August 8, 1961, due to damage, the street sign for Railroad Avenue at Bridge Street was replaced;

**6. Clearing right-of-way**

On February 15, 1962, the Borough requested a resident to remove a dead tree on his property due to the hazard it was causing at the corner of Maple Street and Railroad Avenue;

**7. Sewer installation**

On October 9, 1969, the Borough as a result of a lawsuit by the New Jersey Department of Health (Docket Number C–161–65) in which it agreed to erect a Sanitary Sewer System and Sewage Treatment Plant issued an emergency resolution of $27,000.00 for the resurfacing of roadways (due to the installation of the underground sewerage lines) this project included Railroad Avenue; and

#### 8. Routine road upkeep

For many years and on a routine basis, the Borough had Railroad Avenue chipped and sealed, the most recent occasion being on or about April 28, 1999.

[*LaFevre Cert.* at 6.]

In addition, the Borough has supplied documentation that this road was covered by the Borough engineer's road review and tour in 1998.

Further, reliance on Railroad Avenue for access to the sewer plant has now continued for forty-six years. With respect to the critical question of the installation of sewers in Railroad Avenue in 1968 and 1969, LaFevre certified:

In or about 1968, the Borough in settlement of a lawsuit, established the Milford Borough Sewage Department, on Block 18, Lots 16.01 and 8 and constructed a sewer treatment facility that serves the Borough and portions of Holland Township. The Sewage Treatment Facility was accepted by the Borough on July 28, 1968 and the facility became operational as of October 1, 1968.

With the establishment of the Borough Sewage Department, the Borough issued a sewer bond on December 16, 1968 for $1,204,000 (principal amount $364,000) for the installation of underground sewer lines which included Railroad Avenue and established a sewer connection ordinance on July 7, 1969.

On or about May 5, 1969, the installation of the underground sewer lines was completed, which included the sanitary sewer lines in Railroad Avenue ...

The Borough relies on Railroad Avenue not only to access its properties (Block 18, Lots 6.01 and 8) but also to have the sludge from the Sewage Treatment Plant removed. Sludge is the by-product of the filtering of the effluent and other residues in the sewage treatment process. The sludge removal is performed by a company licensed by the New Jersey Department of Environmental Protection as the sludge is required to be removed regularly to an approved disposal site. On a weekly basis, two 40 foot long tractor-trailers come and each remove 6,000 gallons. Occasionally, due to excess use, a third tractor-trailer during the week for any sludge in excess of the 12,000 gallons a week. The sludge removal is a critical aspect of the sewage treatment process as the Facility is unable to store the sludge on-site due to the pollutants contained in it. The sludge is actually pumped directly out of the Facility into the truck's transfer tanks.

As a result, LaFevre concludes that "[t]he Borough has exerted exclusive control and use of Railroad Avenue for over 30 years."

Finally, the simple act of asserting a claim for possession of the dedicated land can constitute acceptance. *Cunningham & Tischler, supra* 15 *Rutgers L. Rev. at* 397 n. 109 (1961). As stated by our former Supreme Court "[a]n action by municipal authorities to obtain possession of land dedicated to such public uses has

been repeatedly approved by our courts, and it is impossible to conceive how acceptance of such dedication could be more plainly disclosed than by such an action." *Mayor of Atl. City v. Groff,* 64 *N.J.L.* 527, 45 *A.* 916, (Sup.Ct. 1900) (internal citations omitted.) This instant proceeding is such an action.

We have considered Arnold's evidence. He was approached in 1973 with a request to condemn Railroad Avenue in order to clarify its status. Further, he had offered to dedicate the right-of-way for $1.00 and this offer was rejected by the Borough. The Planning Board's action in this regard is also part of the picture. Councilman LaFevre's wife, Noralie LaFevre, the former Borough Clerk, testified as to the failure of the Borough to enforce local traffic ordinances on Railroad Avenue. The record thus does contain some controverted evidence as to whether an acceptance has actually occurred.

However, the more powerful and persuasive evidence is of acceptance. Each of the items described above by Councilman LaFevre is extensively documented. All these documents have been placed in the record. These documents include appropriations, work descriptions, accounts for work done and payments to contractors for work on Railroad Avenue, and of course, the material concerning the sewer. In contrast, the evidence in the other direction is ambiguous. As the Borough points out, the record of the Municipal Court proceedings regarding enforcement of ordinances on Arnold property is not before the court. The 1973 action may have been just as much directed at the ambiguities evident with respect to Railroad Avenue as to a determination by the Borough that it affirmatively had no ownership rights whatsoever. The same is true of the Planning Board and municipal action in 2000 and 2001. They may have felt the Borough owned something, but were not sure what, and thus could not qualify Railroad Avenue as a full street for zoning purposes.

Based on all the evidence, as recited by Councilman LaFevre, and with the extraordinary and even ancient documentation produced in support of each of the Councilman's assertions, the court

finds that there has been an effective acceptance of at least those portions of Railroad Avenue that were dedicated to the Borough in 1867 and 1893.

Finally, this court had been concerned as to whether Milford turned square corners in dealing with Arnold and whether it was refusing to abide by a settlement into which it had entered. The square corners doctrine is enunciated in *FMC Stores Co. v. Borough of Morris Plains,* 100 *N.J.* 418, 495 *A.*2d 1313 (1985). As the Supreme Court there stated, a municipal government

> may not conduct itself so as to achieve or preserve any kind of bargaining or litigational advantage over the property owner. Its primary obligation is to comport itself with compunction and integrity, and in so doing government may have to forego the freedom of action that private citizens may employ in dealing with one another.
>
> [*Id.* at 426–27, 495 *A.*2d 1313.]

The court's initial concern had been that the Borough had not observed the terms of the settlement since it was seeking to condemn what had been contemplated at the time of the settlement. This court has trouble crediting the Borough's current argument that the settlement was not an adjudication on the merits. The parties have in fact changed positions based on this settlement. The court thus must determine whether the Borough's conduct has been unfair.

The nub of the Borough's unfairness to Arnold was its insistence that he had no frontage, while alternatively insisting on its right to use Railroad Avenue. The resolution of that issue is clearly set forth in the settlement agreement as recounted above. It promised Arnold frontage. By condemning a right-of-way, the Borough removed the "catch 22" into which it had placed Arnold, i.e., telling him he had rights in a road for which he was not being credited in a land use application. That issue was resolved by the settlement. He now is bound to have frontage. Accordingly, the unfairness to him has been resolved.

Nor can Arnold persuasively argue at this point that he was expecting a substantial condemnation in the settlement and it getting in effect a decreased one. The initial condemnation com-

plaint involved a mere 5,296 square feet. The present one involves 2,900 square feet. The Borough's valuation of the initial acquisition was $2,500.00. Under the circumstances, it is obvious that the primary benefit in the settlement to Arnold had to be that described above, that is, resolving his land use problem concerning the existence of frontage. Neither the face of the settlement nor the common sense of this situation suggests that the extent of the easement to be taken was a major consideration, or that the reduction in the land in the condemnation from 5,296 square feet to approximately 2,900 constitutes an unfair abuse of power. For these reasons, one square corners argument is rejected.

## CONCLUSION

Based on the above, it is the finding of this court that Exhibit Q-2 accurately sets forth the amount of land properly subject to condemnation in this matter. Counsel for plaintiff shall submit an appropriate order. In addition, an order providing for the appointment of Condemnation Commissioners shall be submitted to the Assignment Judge.